ACCEPTED
06-15-00044-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
10/20/2015 7:43:29 PM
DEBBIE AUTREY
CLERK

## No. 06-15-00044-CV

## IN THE SIXTH DISTRICT COURT OF APPEALS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
10/21/2015 8:59:00 AM
DEBBIE AUTREY
Clerk

### Burlington Resources Oil & Gas Company LP,

*Appellant,*

**v.**

### PetroMax Operating Co., Inc., Woodbine Acquisition, LLC, Petro Texas, LLC, Ch4 Energy II, LLC, and TexCal Energy South Texas L.P.,

*Appellees.*

On Appeal from the 12th Judicial District Court
Madison County, Texas, Cause No. 12-13130-012-10

### BRIEF FOR APPELLANT

Fred Hagans
Kendall C. Montgomery
HAGANS BURDINE MONTGOMERY
 & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006

Kirsten M. Castañeda
Roger D. Townsend
ALEXANDER DUBOSE JEFFERSON
 & TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008

Vincent L. Marable III
PAUL WEBB, P.C.
221 N. Houston Street
Wharton, Texas 77488

John R. Mercy
Mercy ✶Carter ✶Tidwell, L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503

### ATTORNEYS FOR APPELLANT

### Oral Argument Requested

## IDENTITY OF PARTIES AND COUNSEL

**Appellant:**

Burlington Resources Oil &
Gas Company LP

Kirsten M. Castañeda
  State Bar No. 00792401
  kcastaneda@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
  & TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, Texas 75206

Roger D. Townsend
  State Bar No. 20167600
  rtownsend@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
  & TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008

John R. Mercy
  State Bar No. 13947200
  jmercy@texarkanalawyers.com
MERCY ✶ CARTER ✶ TIDWELL, L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503

*Appellate counsel*

Fred Hagans
  State Bar No. 08685500
  fhagans@hagans-law.com
Kendall C. Montgomery
  State Bar No. 14293900
  kmontgomery@hagans-law.com
HAGANS BURDINE MONTGOMERY
  & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006

ii

Vincent L. Marable III
  State Bar No. 12961600
  trippmarable@sbcglobal.net
PAUL WEBB, P.C.
221 N. Houston Street
Wharton, Texas 77488
*Trial and appellate counsel*

Bennie D. Rush
  State Bar No. 17400425
1300 11th Street, Suite 300
Huntsville, Texas 77340-3857
*Trial counsel*

**Appellee**                    Brad D'Amico
PetroMax Operating Co., Inc.      State Bar No. 00783923
                                bd@canteyhanger.com
                              CANTEY HANGER LLP
                              1999 Bryan Street, Suite 3300
                              Dallas, Texas 75201

                              David J. Beck
                                State Bar No. 00000070
                                dbeck@beckredden.com
                              Thomas E. Ganucheau
                                State Bar No. 00784104
                                tganucheau@beckredden.com
                              BECK REDDEN LLP
                              1221 McKinney Street, Suite 4500
                              Houston, Texas 77010-2010
                              *Trial and appellate counsel*

                              David Hammit
                                State Bar No. 08857660
                              DAVID HAMMIT, LLC
                              109 South Madison Street
                              Madisonville, Texas 77864
                              *Trial counsel*

**Appellees**
Petro Texas, LLC,
Ch4 Energy II, LLC

David J. Beck
  State Bar No. 00000070
  dbeck@beckredden.com
Thomas E. Ganucheau
  State Bar No. 00784104
  tganucheau@beckredden.com
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
          *Trial and appellate counsel*

John R. Bankhead
  State Bar No. 01676600
Attorney at Law
110 W. Cottonwood
Madisonville, Texas 77864
          *Trial counsel*

**Appellee**
Woodbine Acquisition, LLC

Greg W. Curry
  State Bar No. 05270300
  greg.curry@tklaw.com
Gregory D. Binns
  State Bar No. 24027148
  greg.binns@tklaw.com
Richard B. Phillips, Jr.
  State Bar No. 24032833
  rich.phillips@tklaw.com
THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
          *Trial and appellate counsel*

Kevin R. Knight
  State Bar No. 11601400
LAW OFFICE OF ROGER KNIGHT, JR.
P.O. Box 925
Madisonville, Texas 77864
          *Trial counsel*

**Appellee**
TexCal Energy South Texas
L.P.

Jesse R. Pierce
  State Bar No. 15995400
  jpierce@pierceoneill.com
Brian K. Tully
  State Bar No. 24039217
  btully@pierceoneill.com
PIERCE & O'NEILL, LLP
4203 Montrose Blvd.
Houston, Texas 77006

*Trial and appellate counsel*

# TABLE OF CONTENTS

Page

Identity of Parties and Counsel ................................................................. ii

Table of Contents ...................................................................................vi

Index of Authorities ...............................................................................ix

Statement of the Case...............................................................................xi

Issues Presented .................................................................................. xii

    1.     Burlington and the PetroMax Defendants disagree about the proper interpretation of an oil and gas assignment, which (in turn) determines whether certain leases are jointly owned and continue in effect an area of mutual interest ("AMI") under an earlier letter agreement.

         a.     Did the trial court err in rejecting Burlington's interpretation as a matter of law, rather than holding the assignment to be ambiguous?

         b.     Alternatively, did the trial court err in concluding that the PetroMax Defendants' interpretation is reasonable, rather than enforcing Burlington's interpretation as a matter of law?

    2.     Burlington also moved for summary judgment on its right to acquire 25% of oil and gas leases or mineral rights acquired by the PetroMax Defendants in the AMI, without any reduction or limitation based on the scope of Burlington's joint ownership of leases/rights within the AMI. Did the trial court err in denying Burlington summary judgment on this issue?

    3.     Did the trial court err in granting the PetroMax Defendants' summary judgment motion and denying Burlington's summary judgment motion?

Introduction....................................................................................1

Summary of the Dispute ........................................................................2

Statement of Facts..............................................................................4

I.  The 1975 Letter Agreement created an Area of Mutual Interest intended to endure as long as any lease in the AMI was jointly owned. ..................................................................................4

II.  Upon succeeding Buttes as a party to the 1975 Letter Agreement, the PetroMax Defendants performed those obligations until 2012. ..........................................................6

III.  The PetroMax Defendants performed under the 1975 Letter Agreement  with knowledge of a subsequent 1994 assignment. .......10

    A.  Southland listed four wells for sale at an auction, as reflected in the resulting assignment. .....................................10

    B.  The PetroMax Defendants obtained two title opinions, both of which interpreted the 1994 Assignment as conveying only Southland's interest in the four wells.............12

IV.  Regardless of its own experts' title opinions, in 2012, the PetroMax Defendants abruptly disavowed their obligations. .............15

V.  The trial court concluded the 1994 Assignment unambiguously conveyed not just the listed wells, but all of Southland's ownership interest in the four leases. ...............................................16

Summary of Argument ......................................................................................17

Argument...........................................................................................................19

I.  The interpretation of the 1994 Assignment as conveying only Southland's interest in four wells—and *not* all of its interest in four entire leases—is reasonable........................................................19

    A.  As reflected in the 1994 Assignment, Southland auctioned its interest in four wells and expressly reserved other interests. .........................................................................20

    B.  Burlington's interpretation comports with the 1994 Assignment's language and harmonizes its provisions. ..........23

    C.  Burlington's interpretation also is consistent with the circumstances surrounding the 1994 Assignment. ..................26

II.     If the PetroMax Defendants' interpretation also were reasonable, the resulting ambiguity would preclude summary judgment, requiring remand. ...........................................................28

III.    However, Burlington offered the only reasonable interpretation of the applicable agreements, requiring rendition in Burlington's favor. ...............................................................30

        A.      The 1994 Assignment conveys only Southland's interest in the four enumerated wells...................................................30

        B.      In addition, the 1975 Letter Agreement does not provide for reduction of Burlington's rights proportionate to the scope of its joint ownership. ....................................................34

Conclusion and Prayer ..................................................................36

Certificate of Compliance.............................................................38

Certificate of Service ...................................................................39

Appendix

        1975 Letter Agreement (CR:589-625) ........................................... Tab 1

        1994 Assignment and Bill of Sale (CR:1029-34) .......................... Tab 2

        Order Granting Defendants' Motion for Summary Judgment on Title Issues (CR:1617).............................................................. Tab 3

        Order Denying Burlington's Motion for Partial Summary Judgment Seeking Various Declarations (CR:1618-19).......... Tab 4

        Order on Joint Motion to Sever and Abate (CR:1640-45)............ Tab 5

Page(s)

**Cases**

*Coker v. Coker*,
650 S.W.2d 391 (Tex. 1983) ...........................................................19, 28, 30, 32

*Columbia Gas Transmission v. New Ulm Gas, Ltd.*,
940 S.W.2d 587 (Tex. 1996) ......................................................................30

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990) ......................................................................36

*Entergy Gulf States, Inc. v. Summers*,
282 S.W.3d 433 (Tex. 2009) ......................................................................29

*Freeman v. Stephens Production Co.*,
171 S.W.3d 651 (Tex. App.—Corpus Christi 2005, pet. denied) .....................25

*Houchins v. Devon Energy Prod. Co., L.P.*,
No. 01-08-00273-CV, 2009 WL 3321406 (Tex. App.—Houston
[1st Dist.] Oct. 15, 2009, pet. denied) (mem. op.)................................................30

*Hous. Expl. Co. v. Wellington Underwriting Ags., Ltd.*,
352 S.W.3d 462 (Tex. 2011) ...................................................................20, 26

*J.M. Davidson, Inc. v. Webster*,
128 S.W.3d 223 (Tex. 2003) ......................................................................19

*Luckel v. White*,
819 S.W.2d 459 (Tex. 1991) ......................................................................32

*Neece v. A.A.A. Realty Co.*,
322 S.W.2d 597 (Tex. 1959) ......................................................................35

*Philipello v. Taylor*,
No. 10-11-00014-CV, 2012 WL 1435171 (Tex. App.—Waco Apr.
25, 2012, pet. denied) (mem. op.)................................................................20, 27

*R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*,
596 S.W.2d 517 (Tex. 1980) ......................................................................32

Page(s)

*Sun Oil Co. v. Madeley*,
   626 S.W.2d 726 (Tex. 1981) ..............................................................20, 27, 29

**Treatises**

Patrick H. Martin & Bruce M. Kramer, 2 WILLIAMS & MEYERS OIL &
   GAS LAW § 432 (4th ed. 2010) ............................................................................6

## STATEMENT OF THE CASE

*Nature of the Case:*  This is an oil and gas dispute. The parties disagree about whether Burlington jointly owns an interest in some leases in an area of mutual interest ("AMI"), as required to continue that AMI in effect. CR:445, 593, 1384. This question, in turn, is controlled by whether a 1994 Assignment: (1) conveyed an interest in four denominated wells while reserving other interests in four leases; or (2) conveyed all interests in four entire leases. CR:484-85; 1SCR:21-22.

*Course of Proceedings:*  Appellant (Plaintiff Burlington) filed suit against Appellees (collectively, the "PetroMax Defendants"), asserting claims such as breach of contract and declaratory judgment regarding its ownership rights and the AMI's continuing effect. CR:443-48. The PetroMax Defendants denied these claims, Appellee PetroMax asserted a counterclaim for suit to quiet title, and Appellee Woodbine asserted counterclaims for suit to try title, trespass-to-try title, and declaratory judgment. CR:365, 1378-87. Burlington and the PetroMax Defendants filed competing summary-judgment motions on Burlington's ownership rights relating to the AMI. CR:484-85; 1SCR:21-22.

*Trial Court Disposition:*  The trial court denied Burlington's summary-judgment motion. CR:1618-19 (Apdx. Tab 4). The trial court granted the PetroMax Defendants' summary judgment on title issues, ruling that:

> (1) Burlington owns no interest in the AMI; and

> (2) the AMI provision has terminated.

CR:1617 (Apdx. Tab 3).

On the parties' joint motion, the trial court severed the remaining claims in order to render its summary judgment rulings final and abated the severed action pending this appeal. CR:1640-45 (Apdx. Tab 5).

xi

## ISSUES PRESENTED

1.     Burlington and the PetroMax Defendants disagree about the proper interpretation of an oil and gas assignment, which (in turn) determines whether certain leases are jointly owned and continue in effect an area of mutual interest ("AMI") under an earlier letter agreement.

     a.     Did the trial court err in rejecting Burlington's interpretation as a matter of law, rather than holding the assignment to be ambiguous?

     b.     Alternatively, did the trial court err in concluding that the PetroMax Defendants' interpretation is reasonable, rather than enforcing Burlington's interpretation as a matter of law?

2.     Burlington also moved for summary judgment on its right to acquire 25% of oil and gas leases or mineral rights acquired by the PetroMax Defendants in the AMI, without any reduction or limitation based on the scope of Burlington's joint ownership of leases/rights within the AMI. Did the trial court err in denying Burlington summary judgment on this issue?

3.     Did the trial court err in granting the PetroMax Defendants' summary judgment motion and denying Burlington's summary judgment motion?

## INTRODUCTION

When parties disagree about the proper interpretation of a contract, a trial court cannot reject a reasonable interpretation through summary judgment. If only one interpretation is reasonable, the trial court may grant summary judgment consistent with that interpretation. If more than one reasonable interpretation exists, no summary judgment may be granted. There is not a third option by which a trial court may choose between two reasonable contract interpretations—discarding one and embracing another—as a matter of law.

Burlington and the PetroMax Defendants disagree on the proper interpretation of an oil and gas assignment. Burlington's interpretation is reasonable. It comports with the circumstances surrounding the assignment, honors the assignment's language, and harmonizes all the assignment's provisions. Indeed, two noted oil and gas lawyers hired by the PetroMax Defendants to offer title opinions---years before this lawsuit was filed---reached the same interpretation.

Yet, when each side moved for summary judgment on its interpretation of the Assignment, the trial court not only denied Burlington's motion, but also granted the PetroMax Defendants summary judgment consistent with their interpretation.

The claims on appeal should be remanded (if the competing interpretation is reasonable) or judgment rendered in Burlington's favor (if the competing interpretation is not reasonable). Either way, the summary judgment cannot stand.

1

## SUMMARY OF THE DISPUTE

The proper interpretation of the oil and gas assignment at issue will determine whether Burlington currently has rights in an area of mutual interest (the "AMI"). The AMI was created by agreement in 1975 (the "1975 Letter Agreement"), and it continues in effect as long as the 1975 Letter Agreement's parties jointly own any leases within the AMI. It is undisputed that a lease called the Wilson Lease is located in the AMI. Whether the AMI continues in effect turns on whether Burlington's ownership interest in the Wilson Lease was conveyed by a later assignment (the "1994 Assignment").

Burlington contends that it currently owns part of the Wilson Lease, which means the AMI continues in effect. If the AMI continues in effect, the 1975 Letter Agreement requires the PetroMax Defendants to offer Burlington a 25% working interest in all leases and mineral rights they have acquired in the AMI.

The PetroMax Defendants contend that the ownership interests claimed by Burlington were conveyed away by the 1994 Assignment, which would mean the AMI terminated years ago. If the AMI no longer exists, Burlington has no right under the 1975 Letter Agreement to acquire a 25% working interest in the leases/rights the PetroMax Defendants have obtained in the AMI.

None of the parties in this case was an original party to the 1975 Letter Agreement or the 1994 Assignment. Therefore, before delving into the relevant

2

facts, it is helpful to understand how everyone came to be involved in this dispute:

- The 1975 Letter Agreement creating the AMI, and its attached Joint Operating Agreement, was between Aztec Oil & Gas Company and Buttes Resources Company. CR:589-625 (Apdx. Tab 1).

- <u>Aztec's</u> rights and obligations under the 1975 Letter Agreement passed through company mergers to Southland Royalty and ultimately to Burlington. CR:485 n.1, 626-30, 631-34, 635-36, 637.

  - ➢ The 1994 Assignment, which was signed during the period that Southland had succeeded to Aztec's rights, is between Southland and Samson Resources Company (which is not a party to this lawsuit). CR:1029-34 (Apdx. Tab 2).

- Through a variety of agreements signed at various points in time, the PetroMax Defendants acquired part of <u>Buttes'</u> interests in the AMI, subject to Buttes' rights and obligations under the 1975 Letter Agreement and 1975 JOA. CR:489-90, 638-46, 647-58, 659-60, 661-62, 663-785.

  - ➢ Most of the communications between the parties relevant to this dispute occurred between Burlington and three of the PetroMax Defendants: PetroMax Operating Co., Inc., Woodbine Acquisition LLC, and TexCal Energy South Texas L.P.

3

## STATEMENT OF FACTS

To understand the 1994 Assignment, one must first understand the interests to which it applied. Hence, we present our Statement of Facts chronologically.

**I.      The 1975 Letter Agreement created an Area of Mutual Interest intended to endure as long as any lease in the AMI was jointly owned.**

Forty years ago, Aztec and Buttes agreed to explore and develop oil and gas leases together. *See* CR:589. Back in 1975, Buttes owned an undivided one-half working interest in nine oil and gas leases. CR:589, 596. Through the 1975 Letter Agreement, Buttes conveyed to Aztec an undivided 25% interest in the leases. CR:589, 591-92. For future leases they might acquire, the parties established an Area of Mutual Interest ("AMI"). CR:593.

If either party acquires a lease or mineral rights within the AMI, the 1975 Letter Agreement requires the acquiring party to offer the other party the same proportionate interest as in the original nine leases. *Id.* Accordingly, if Aztec (now Burlington) acquires leases in the AMI, Buttes (whose interests are now partially held by the PetroMax Defendants) must be offered a 75% interest; likewise, if the PetroMax Defendants acquire leases in the AMI, then Burlington must be offered a 25% interest. *Id.* To accept, the offeree must elect participation within 15 days and reimburse the other for its share of the acquisition costs. *Id.*

A Joint Operating Agreement (the "1975 JOA") governs operation and participation in wells drilled on jointly-held leases within the AMI. To drill a well

4

on the jointly-held leases without all parties' consent, the 1975 JOA requires the party wishing to drill to notify the other parties in advance and give them a chance to participate. CR:602-03 (§§11, 12).

The 1975 Letter Agreement provides that the AMI continues in effect as long as jointly owned leases exist in the AMI. CR:593. After the first three years, the AMI shrank to a boundary two miles outside the jointly-owned leases in the area at that time. CR:593-94. As it turned out, at the end of three years, all nine original leases remained jointly owned. CR:487; *see also* CR:74-75. So, the AMI continued in effect with a boundary of two miles outside those leases. CR:594.

It is undisputed that five of the original leases no longer exist and that a sixth lease is no longer jointly owned by Aztec's successor-in-interest, Burlington.[1] Three of the original leases remain in the AMI: (1) the Wilson Lease; (2) the Gibbs Lease; and (3) the Buchanan Lease. RR:7, 33. Burlington claims an ownership interest in each of these leases, but for purposes of summary judgment, focused its attention on the Wilson Lease. CR:436, 490-99; RR:7.

---

[1] Four of the original leases terminated in 1979 at the end of their primary terms. CR:74. With regard to a fifth lease, all but one well was assigned to a third party in 1981, and the remaining well was assigned to another third party in 1997. CR:74, 77. A sixth lease expired upon cessation of production in 1999. CR:74.

5

**II.**  **Upon succeeding Buttes as a party to the 1975 Letter Agreement, the PetroMax Defendants performed those obligations until 2012.**

The PetroMax Defendants succeeded to Buttes' rights and obligations under the 1975 Letter Agreement, and they initially acknowledged and performed those obligations. In doing so, they repeatedly recognized Burlington's continuing ownership rights in the Wilson Lease.

For example, when defendant TexCal conveyed to defendant PetroMax certain rights in the Wilson Lease in a 2009 farmout agreement,[2] they both acknowledged Burlington's rights to notice and participation in wells governed by the 1975 JOA. CR:647, 651, 658-59. Indeed, TexCal limited PetroMax's right to earn under the farmout agreement to wells in which "Third Parties" did *not* participate. CR:656. "Third Parties" included Burlington (denoted by the name of its parent, ConocoPhillips). CR:656. And, in proposing the initial test well and subsequent wells contemplated by the farmout agreement, PetroMax would be required to give notices under the 1975 JOA. *Id.*[3]

---

[2] A "farmout agreement" is a contract to assign oil and gas lease rights in certain acreage upon the completion of drilling obligations and the performance of any other covenants and conditions set forth in the agreement. Patrick H. Martin & Bruce M. Kramer, 2 WILLIAMS & MEYERS OIL & GAS LAW § 432 (4th ed. 2010).

[3] *See also* CR:659 (amending Farmout Agreement to remove from excepted lands—*i.e.*, to add to the acreage subject to Farmout Agreement—the 160-acre drilling unit for the Wilson #5 Well), 661-62 (amending the DeFacto Termination provision and again including provisions regarding continuing rights to notice and participation under 1975 JOA).

Similarly, in 2011, defendants Woodbine, PetroMax, Petro Texas, and CH4 Energy expressly acknowledged in a Purchase and Sale Agreement that "Burlington Oil & Gas Company owns an undivided 25% interest in and to 1537.83 acres out of that certain Oil and Gas Lease dated August 29, 1974, between James D. Wilson, as Lessor, and Curran R. Campbell, Inc., as Lessee . . . ," *i.e.*, the Wilson Lease. CR:663, 781. The defendants further acknowledged that "[t]his is an outstanding interest that has been non-consented in both the Wilson #1H and Wilson #2H wells." *Id.* They also "anticipated that Burlington (now Conoco-Phillips) will continue to go non-consent on future wells." *Id.*

In addition to these acknowledgments and agreements among themselves, the PetroMax Defendants asserted the AMI's continuing force and effect—and Burlington's continued joint ownership of the Wilson Lease—in communications with Burlington. For instance, in 2009, TexCal and PetroMax sent Burlington Authorities for Expenditure ("AFEs") regarding participation in drilling the Wilson #1H and #2H wells (*i.e.*, the same wells referenced two years later in the Woodbine/PetroMax Purchase Agreement discussed above). CR:786-87, 793-94. The cover letters identify TexCal "as the current Operator of the Contract Area covered by" the 1975 JOA. CR:786, 793. In proposing that PetroMax drill these two wells on the Wilson Lease, both letters also notify Burlington that, "[i]n accordance with the provisions of Article 12 of the JOA, you have 30 days after receipt of this

7

notice in which to indicate your election to participate in the proposed drilling of the above referenced well and to pay the cost thereof." CR:787, 794. The enclosures (*i.e.*, ballots and accompanying AFEs) reflect that, upon an election to participate, Burlington would have a 25% working interest in the proposed wells. CR:789, 792, 796.

PetroMax also sent Burlington an AFE proposing to drill another well[4] on the Wilson Lease. CR:804-09. In the cover letter, PetroMax stated that, under the terms of the 1975 JOA, Burlington had 30 days after receipt to return its election to participate. CR:804. And, after Woodbine acquired interests from PetroMax, Woodbine sent AFEs to Burlington for drilling five additional wells[5] on the Wilson and Gibbs Leases. CR:810-12, 814-17, 820-21, 825-26, 832-33, 837-38, 849-50.

As anticipated, Burlington went "non-consent" on several of the proposed wells.[6] CR:496-97. For each of these wells, Burlington wrote to Woodbine in 2012 and requested that Woodbine provide payout statements, regulatory information, and plats. CR:497. Woodbine provided payout statements dated May 30, 2012, reflecting

---

[4] This AFE concerned the Dunman/Wilson No. 1-H Well. CR:804.

[5] These AFEs concerned the Wilson #3H, Wilson #6H, Wilson #5H, Gibbs #1H (later drilled as the Gibbs #2H Well), and Dunman Wilson A #2H wells. CR:810-12, 814-17, 820-21, 825-26, 832-33, 837-38, 849-50.

[6] These non-consent wells were the Dunman/Wilson No. 1-H, Wilson #1H, Wilson #2H, Wilson #3H, and Wilson #6H wells. CR:496-97.

8

Burlington's working interest in the non-consent wells on the Wilson Lease as follows (CR:497-98):

| Non-Consent Well | Burlington Interest |
|---|---|
| Wilson #1H Well | .25 |
| Wilson #2H Well (a/k/a Wilson Unit "A" # 2H) | .24531250 |
| Wilson #3H Well | .24531250 |
| Wilson #6H Well | .25 |
| Dunman/Wilson No. 1-H Well | .10535714 |

Burlington did elect to participate in other wells on the Wilson and Gibbs Leases, including the Wilson #5H Well.[7] CR:820, 1136-37. Woodbine accepted Burlington's election to participate in the Wilson #5H Well. CR:498, 1137. Woodbine also availed itself of the benefits of the 1975 Letter Agreement, accepting Burlington's payments of its share of the required costs. CR:498; *see also* CR:1137. In accordance with its obligations under the 1975 Letter Agreement, Woodbine paid Burlington proceeds from the Wilson #5H Well totaling $1,335,253.59. CR:498, 1137.

---

[7] The wells in which Burlington elected to participate were the Wilson #5H, Gibbs #1H, and Dunman Wilson A #2H wells. CR:820, 1136-37.

**III.** **The PetroMax Defendants performed under the 1975 Letter Agreement with knowledge of a subsequent 1994 assignment.**

During the years that the PetroMax Defendants performed their obligations under the 1975 Letter Agreement and recognized Burlington's ownership rights in the Wilson Lease, they did so with knowledge of a 1994 Assignment of certain interests by a previous Aztec successor-in-interest, Southland Royalty.

**A.** **Southland listed four wells for sale at an auction, as reflected in the resulting assignment.**

In 1994, Southland listed for sale in an auction its interests in four wells in the AMI: (1) the Wilson James D. Unit 2; (2) the Wilson James D. #3 (misspelled as the "Wilson James D.O." well); (3) the Buchanan 1; and (4) the Gibbs Bros. 1. CR:1497. We will refer to the first two wells, both offered for auction from the Wilson Lease, as Wilson #2 and Wilson #3. These two wells were located on one of the two separate tracts of land that comprise the Wilson lease. *Id.*

As shown by the map on the following page, the Wilson Lease consists of two non-contiguous tracts.

10

- Tract 1 is the larger tract and contains the Wilson #1, Wilson #4, and Wilson #5 wells.

- Tract 2 is the separate, smaller tract and contains the Wilson #2 and Wilson #3 wells.



At the auction, Samson Resources Company purchased the interests sold by Southland. CR:1029. Southland and Samson signed the 1994 Assignment. CR:1031. The assignment provides for an Exhibit A that will both: (1) particularly describe the Interests—including "oil and gas leases, leasehold interests, rights, and interests attributable or allocable to the oil and gas leases or leasehold interests by virtue of

11

pooling, unitization, communitization, and operating agreements" being conveyed; and (2) specifically note and reflect the "certain lands, leases, properties, interests, leasehold rights, depths or formations" that Southland "reserves and retains unto itself from the Interests . . . ." CR:1029. Thus, the Assignment provided that Exhibit "A" would set forth both the interests being conveyed away and the interests being reserved by Southland.

Indeed, Exhibit "A" contains two separate lists:

    (1)    a list of four leases owned by Southland, with an exception for lands attributable to wells Southland previously had farmed out; and

    (2)    a list of "Associated Wells."

CR:1033. Unfortunately, Exhibit "A" does *not* specify which list sets forth the conveyed interests and which list sets forth the reserved interests. *Id.* However, consistent with the listing of only four wells in the auction catalog, the very first words in the 1994 Assignment are: "Well Name: BUCHANAN 1, GIBBS BROS 1, WILSON JAMES 2 AND WILSON JAMES 3". *Id.*

**B.    The PetroMax Defendants obtained two title opinions, both of which interpreted the 1994 Assignment as conveying only Southland's interest in the four wells.**

The two lists in Exhibit A to the 1994 Assignment led to confusion for both the PetroMax Defendants and Burlington. Consequently, before sending the 2009

12

AFEs to Burlington in connection with drilling on the Wilson Lease, TexCal and PetroMax obtained two title opinions about whether Burlington still owned any working interest in that lease.

In 2007, TexCal retained J. Jan Jircik, a Texas lawyer who is Board Certified in Oil, Gas and Mineral Law by the Texas Board of Legal Specialization, to perform a title opinion. CR:860. Jircik did not interpret the 1994 Assignment as conveying all of Southland's interest in the Wilson Lease, but instead interpreted the 1994 Assignment as if it included only Southland's interest in the Wilson #2 and Wilson #3 wells and the associated production units, *i.e.*, Southland's interest in Tract 2. CR:896. Jircik opined that the interest Southland had reserved in the Wilson Lease "was eventually acquired by Burlington Resources Oil & Gas Company, L.P." *Id.* Accordingly, as to the two Wilson wells listed for auction, expressly identified at the top of the 1994 Assignment, and included as "Associated Wells" on its Exhibit "A," Jircik concluded that Burlington did not own any gross working interest. CR:863-64. But as to wells located on Tract 1 of the Wilson Lease,[8] Jircik opined that Burlington owned a gross working interest of .2500000. CR:862, 865-66.

In 2009, PetroMax retained Ronald Moore, another Texas lawyer Board Certified in Oil, Gas and Mineral Law by the Texas Board of Legal Specialization,

---

[8] At the time, these wells were the Wilson #1, Wilson #4, and Wilson #5 Wells. CR:862, 865-66.

to provide a title opinion on acreage in the Wilson lease. CR:1035. Moore likewise concluded that Burlington owned a working interest in several portions of the Wilson lease. CR:1035-37.

Jircik's opinion was provided to PetroMax and Woodbine. CR:501. There is no evidence, however, that either of the title opinions was provided to Burlington. Upon receiving the 2009 AFEs from PetroMax proposing wells to be drilled on the Wilson Lease, Burlington initially informed PetroMax that it "has completed a diligent review of files internal and external and determined Burlington has no working interest. The files show that all interest has been conveyed out to other parties." 3SCR:2075; RR:51-52.

In response to Burlington's contention, Moore supplemented his opinion. CR:1079. He set forth "Jircik's *and our* interpretation" that Burlington did own a "25% WI in Wilson Lease less 160 acre Production Units for Wilson No. 2 and 3 wells". CR:1080 (emphasis added). He also opined that, in the 1994 Assignment, "Southland Royalty Company assigned what appears to be only its interest in the Wilson Well Nos. 2 and 3 Production Units to Samson Resources Company, leaving the balance of its interest still owned by Southland (2210/34)." CR:1079.

Burlington later reached the same conclusion. As described above in Section II, Burlington elected to participate in certain wells and paid its share of the costs.

14

Burlington also asserted its right to payout statements and other information regarding non-consent wells in which it did not elect to participate.

In sum, for 18 years, Burlington and the PetroMax Defendants operated consistently with the interpretation of the 1994 Assignment as conveying only the interests offered at auction:  the four wells and associated production units.

**IV.     Regardless of its own experts' title opinions, in 2012, the PetroMax Defendants abruptly disavowed their obligations.**

In 2012, the PetroMax Defendants abruptly changed position. Woodbine asserted that, contrary to the Jircik opinion, Burlington had "divested the last of its interest in the Wilson Lease as of September 9, 1994" and "does not own an interest in . . . the Wilson Lease . . . ." CR:1130. Woodbine attempted to return to Burlington $190,692.84, purported to be the costs Burlington had paid in association with the Wilson #5H well minus the well proceeds Woodbine had already paid Burlington. CR:1130-31. Woodbine also stopped work on another proposed well in which Burlington had elected to participate.[9] *See* CR:1131. Only after repudiating Burlington's right to participate did Woodbine drill that well. *Id.*

Burlington's demands for the PetroMax Defendants to comply with the ongoing requirements of the 1975 Letter Agreement have been met consistently with refusal. CR:1130-31, 1138-40. Woodbine has obtained permits for at least 11 wells

---

[9] This was the Dunman Wilson A #2H well. CR:1130-31.

associated with the Wilson lease, without providing Burlington notice or an opportunity to participate. CR:1138-39. Woodbine and PetroMax also have acquired leases within the AMI without offering the requisite 25% working interest to Burlington. CR:1139.

## V. The trial court concluded the 1994 Assignment unambiguously conveyed not just the listed wells, but all of Southland's ownership interest in the four leases.

Burlington filed the underlying lawsuit in order to enforce its rights under the 1975 Letter Agreement and 1975 JOA. CR:433-49. Besides requesting declaratory relief, Burlington brought separate claims for, *inter alia*, breach of contract, specific performance, conversion, and breach of duty to pay proceeds. CR:443-48. In addition to the PetroMax Defendants' denials of these claims (CR:322, 364-65, 1390-91, 1397-98), PetroMax asserted a counterclaim for suit to quiet title, and Woodbine asserted counterclaims for suit to try title, trespass-to-try title, and declaratory judgment. CR:365, 1378-87. Burlington and the PetroMax Defendants filed competing summary-judgment motions on the questions regarding Burlington's ownership rights relating to the AMI. CR:484-85; 1SCR:21-22.

Each side moved for summary judgment regarding Burlington's ownership interest in any leases within the AMI to continue the AMI in effect. CR:484-85; 1SCR:21-22. The trial court denied Burlington's summary-judgment motion, but

granted the PetroMax Defendants' competing motion on title issues. CR:1617-19. The trial court ruled that:

1.      Burlington does not own any interest in the AMI described in the 1975 Letter Agreement made the basis of this suit; and

2.      The AMI provision in the 1975 Letter Agreement has terminated.

CR:1617.

On joint motion by all parties, the trial court severed the remaining claims into a separate lawsuit in order to render its partial summary judgment final. CR:1632, 1635, 1640-43. The trial court then abated the severed case pending this appeal. CR:1643. Thus, the severed issues remain pending and are not presented for review in this appeal.

## SUMMARY OF ARGUMENT

Burlington's interpretation of the 1994 Assignment is reasonable. Burlington's interpretation comports with the very first words of the assignment, setting forth only interests in four wells to be conveyed. Burlington's interpretation also honors the assignment's reservation provision. Unless Exhibit A is interpreted so that the list of wells sets forth the interests being conveyed and the list of leases sets forth the interests being reserved, the reservation provision would be rendered meaningless.

Moreover, Burlington's interpretation is consistent with the circumstances surrounding the assignment. Only Southland's interests in four wells were offered for sale at auction. And the interpretation's reasonableness is confirmed by two title opinions from board certified lawyers who were hired long before suit was filed, not by Burlington, but by the PetroMax Defendants.

Because Burlington's interpretation is reasonable, the trial court's summary judgment rejecting that interpretation cannot stand. What happens next—remand or rendition—depends on whether the PetroMax Defendants' competing interpretation also is reasonable.

If the competing interpretation were reasonable, the 1994 Assignment would be ambiguous. On that basis, the matter should be remanded for trial. But if, as shown below, the PetroMax Defendants' interpretation is unreasonable, then as a matter of law, Burlington is entitled to rendition of judgment that the AMI continues in effect.

Burlington also moved for summary judgment that its right to obtain a 25% working interest in leases and mineral rights is not proportionately reduced based on any decrease in the scope of Burlington's joint ownership interests generally in the AMI. The 1975 Letter Agreement provides for proportionate reduction of the 25% requirement under other circumstances, but not based on diminution of the number

or size of leases/rights held jointly by Burlington in the AMI. Accordingly, Burlington also is entitled to summary judgment on this point.

**ARGUMENT**

**I.     The interpretation of the 1994 Assignment as conveying only Southland's interest in four wells—and *not* all of its interest in four entire leases—is reasonable.**

The 1994 Assignment expressly provides that its Exhibit A lists both the interests being conveyed and the interests being reserved. CR:1029. The problem is that, in setting forth the two lists, Exhibit A does not expressly identify which list sets forth the interests being conveyed and which sets forth the interests being reserved. *See* CR:1033. But the language and circumstances surrounding the creation of the 1994 Assignment demonstrate that it is reasonable to interpret the 1994 Assignment to convey only Southland's interest in the enumerated wells.

Whether a contract is ambiguous is a question of law. *E.g.*, *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A contract is ambiguous whenever it is reasonably susceptible to more than one meaning. *Id.* at 393. When a contract is ambiguous, its interpretation presents a question of fact precluding summary judgment. *Id.* at 394.

In determining whether a contract is ambiguous, courts examine and consider the entire writing, striving to harmonize and give effect to all provisions so that none is rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Coker*, 650 S.W.2d at 393. Courts also consider the facts and circumstances

19

surrounding the contract's execution. *E.g.*, *Hous. Expl. Co. v. Wellington Underwriting Ags., Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731-32 (Tex. 1981); *Philipello v. Taylor*, No. 10-11-00014-CV, 2012 WL 1435171, at *7 (Tex. App.—Waco Apr. 25, 2012, pet. denied) (mem. op.). In this case, the 1994 Assignment's text and surrounding circumstances establish that Burlington's interpretation is reasonable.

## A. As reflected in the 1994 Assignment, Southland auctioned its interest in four wells and expressly reserved other interests.

The 1994 Assignment exists because Southland decided to auction off its interest in four wells. CR:1497. Consistent with Southland's auction listing, the first words in the 1994 Assignment are: "Well Name: BUCHANAN 1, GIBBS BROS 1, WILSON JAMES 2 AND WILSON JAMES 3". *Compare* CR:1029 (emphasis in original) *with* CR:1497 (auction listing). The 1994 Assignment expressly provides that Southland is conveying some interests, but reserving others. CR:1029. The assignment discusses both conveyance and reservation in general terms, expressly leaving the particulars and specifics to be set forth in Exhibit A. *Id.*

In describing the conveyance and reservation generally, the 1994 Assignment speaks in broad, generic terms. For instance, the assignment describes the interests being conveyed (defined collectively as the "Interests") to include:

> The oil and gas leases, leasehold interests, rights and interests attributable or allocable to the oil and gas leases or leasehold interests by virtue of pooling, unitization, communitization, and operating

20

agreements, licenses, permits, and other agreements, all more particularly described on Exhibit "A" hereto, limited as to the lands and depths indicated on Exhibit "A" (collectively the "Leases"), together with identical undivided interests in and to all the property and rights incident thereto . . . .

CR:1029. And, the assignment describes the interests being reserved equally broadly (*id.*):

[Southland] reserves and retains unto itself from the Interests those certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit "A" . . . .

As provided in the 1994 Assignment, Exhibit A sets forth two lists in the following format: (1) a list of all the interests Southland owned in four leases; and (2) a list of the same four wells on the assignment's first page:

EXHIBIT A

Page 1 of Exhibit

| CO FILE NO | TYPE INSTRUMENT | INST DATE | GRANTOR LESSOR | GRANTEE LESSEE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|
| 02118700 | OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | CURRAN R. CAMPBELL, INC. | 21/661 BRAZOS COUNTY | 943 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118800 | OIL AND GAS LEASE | 08/14/74 | GIBBS BROTHERS AND COMPANY | CURRAN R. CAMPBELL, INC. | 203/414 MADISON COUNTY | 184.1 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118900 | OIL AND GAS LEASE | 08/29/74 | JAMES D. WILSON, IND. & IND. EX. | CURRAN R. CAMPBELL, INC. | 203/464 MADISON COUNTY, 21/667 BRAZOS COUNTY | 2072.33 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02119500 | OIL AND GAS LEASE | 10/11/74 | RAYMOND B. BUCHANAN, ET UX | CURRAN R. CAMPBELL, INC. | 21/679 BRAZOS COUNTY | 222.06 ACRES, MORE OR LESS, DESCRIBED IN LEASE. LESS AND EXCEPTED FROM THE ABOVE ARE THE LANDS ATTRIBUTABLE TO THE H. K. ODOM WELLS, JAMES D. WILSON #4 WELL AND THE BUCHANAN #2 WELL. |

ASSOCIATED WELLS:

| PROPERTY NUMBER | DP WELL NUMBER | WELL NAME | LOCATION |
|---|---|---|---|
| 21188 | 24300 | GIBBS BROS 1 | A. HUNLEY SVY., A-176 |
| 21189 | 1409,81464 | WILSON JAMES D #3 | JESSE K. DAVIS SVY., A-103 |
| 21189 | 85900 | WILSON JAMES D #2 | JESSE K. DAVIS SVY., A-103 |
| 21195 | 6900 | BUCHANAN 1 | HARDIN NEVELLE SVY., A-185 |

21

The top list is untitled. CR:1033. It names the Odom, Gibbs, Wilson, and Buchanan Leases:



The right side of the top list sets forth the legal description of each lease. *Id.* Under the legal descriptions appears an exception for acreage Southland had farmed out and retained only an overriding royalty interest:



Thus, the top list specifically notes and reflects all of Southland's ownership interest in the entirety of the four, denominated leases.[10]

On the other hand, the bottom list names only the wells that appear at the top of the 1994 Assignment and in the auction catalogue:



## B. Burlington's interpretation comports with the 1994 Assignment's language and harmonizes its provisions.

Interpreting Exhibit A so that the top list describes the interests Southland is reserving from the 1994 Assignment and the bottom list describes the interests Southland is conveying is consistent with: (1) the list of four wells at the top of the assignment; (2) the language providing that Exhibit A describes both interests being conveyed *and* interests being reserved to Southland; and (3) the entire reservation provision, which expressly provides that Southland reserves and retains to itself the

---

[10] After the 1994 Assignment was signed, the Odom Lease expired upon cessation of production in 1999. CR:74.

certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit A. *Compare* CR:1029 (setting forth language in 1994 Assignment) *with* CR:1033 (Exhibit A). If both lists in Exhibit A described the interests conveyed, then contrary to the reservation provision, no part of Exhibit A would note or reflect any interest being reserved.

The exception, in the top list of leases, of acreage Southland had previously farmed out from the four leases does not constitute a "reservation." The exception describes an interest Southland did not own. By definition, Southland could not "reserve and retain unto itself" an interest it did not own. Rather than constituting the reservation, the exception describes what is *not* included in the reservation: the portions of the leases that Southland had farmed out under a previous agreement. *See* CR:74-75, 82-85, 501-05, 1380-81. Without this exception, the top list would not have accurately described all of the interest Southland owned in the four leases. By accurately describing the interest Southland did own in the four leases, the top list identifies with reasonable certainty the interest Southland reserved and retained unto itself from its conveyance of the four wells.

The PetroMax Defendants suggest instead that use of the term "leases" in the description of the interests being conveyed must mean that the 1994 Assignment conveys the leases set forth in Exhibit A. Yet, the term "leases" appears in both the provision describing the interests being conveyed and the provision describing the

24

interests being reserved. CR:1029. Because it is used to describe generally both types of interests, the term does not aid in determining whether the list of leases on Exhibit A describes the interests being conveyed or the interests being reserved. Moreover, in describing both conveyed and reserved interests, the assignment speaks not only of "leases," but also of "interests" less than an entire lease. *Id.* So, just as it is possible that an entire lease could fall into either category, it is possible for interests less than an entire lease (*i.e.*, four wells and their associated production units) to fall into either the category of interests being conveyed or the category of interests being reserved.

The general use of the term "leases" must be read in conjunction with the list of specific wells set forth at the top of the same page. For example, in *Freeman v. Stephens Production Co.*, 171 S.W.3d 651, 653 (Tex. App.—Corpus Christi 2005, pet. denied), a deed purported to convey "that certain lot, tract or piece or parcel of land . . . ." Despite this general description of the interests conveyed as a single lot, the deed later specifically described the interests conveyed as "All of Lot 1, Block 15; Lot 2, Block 15; The West 17.51 acres of Lot 3, Block 15; All of Lot 10, Block 15," etc. *Id.* Reading the entire deed as a whole, it was reasonable to interpret the singular phrase "lot, tract or piece or parcel of land" to mean multiple lots. *Id.* at 654. In this case, it is equally reasonable to interpret the interests collectively defined as the "Leases" to mean only the wells and related production units specifically identified at the top of the first page. *Compare id.* at 653-54 *with* CR:1029.

Unless Southland's interest in the four wells was the only interest being conveyed, there was no reason to list those four wells at the top of the first page or in Exhibit A. If the 1994 Assignment conveyed all of Southland's interest in the four leases, there was no reason to highlight four of the wells on those leases. Southland's interest in the four wells already would be part of the conveyance of all its interest in the leases. Nor can the list of "Associated Wells" be explained as an inventory of all the wells on the four leases. For example, the "Associated Wells" list does not identify the Wilson #1 well. *See* CR:1033.

The plain language of the 1994 Assignment establishes the reasonableness of Burlington's interpretation. Southland assigned only its interest in the enumerated wells (*i.e.*, the wellbores and related production units), while reserving the remainder of its interest in the Wilson, Gibbs, Buchanan, and Odom leases.

**C.      Burlington's interpretation also is consistent with the circumstances surrounding the 1994 Assignment.**

Even without considering the surrounding circumstances, Burlington's interpretation comports with the language in, and harmonizes the provisions of, the 1994 Assignment. *See Argument* §I(A), supra.  Nonetheless, it is appropriate also to consider the circumstances surrounding the assignment. Circumstances that existed prior to and contemporaneous with the execution of the 1994 Assignment are properly examined in determining whether the assignment is ambiguous. *See Hous.*

26

*Expl.*, 352 S.W.3d at 469; *Madeley*, 626 S.W.2d at 731-32; *Philipello*, 2012 WL 1435171, at *7.

Southland offered for auction only its interest in four wells. CR:1497. Southland did not list for auction only the wellbore, nor did it offer the entire leasehold. Instead, Southland's auction listings encompassed:

(1)     its interest in the Wilson #3, Buchanan 1, and Gibbs Bros 1 wells; and

(2)     an "after payout only" interest ("APO") only with regard to the Wilson James D. Unit 2 Well.

```
BUCHANAN 1                              TX              BRAZOS
BPO WI     .250000     APO WI   .250000        BOPD         14.00
BPO NRI    .203333     APO NRI  .203333        MCFD         28.00
BPO ORRI   .000000     APO ORRI .000000        KURTEN WOODBINE
OPERATOR: BUTTES RESOURCES CO    SELLER: SOUTHLAND ROYALTY

GIBBS BROS 1                            TX              BRAZOS
BPO WI     .250000     APO WI   .250000        BOPD         4.00
BPO NRI    .198125     APO NRI  .198125        MCFD         9.00
BPO ORRI   .000000     APO ORRI .000000        KURTEN WOODBINE
OPERATOR: BUTTES RESOURCES CO    SELLER: SOUTHLAND ROYALTY

WILSON JAMES D 0                        TX              BRAZOS
BPO WI     .250000     APO WI   .250000        BOPD         3.00
BPO NRI    .203333     APO NRI  .203333        MCFD         SHUT-IN
BPO ORRI   .000000     APO ORRI .000000        KURTEN WOODBINE
OPERATOR: BUTTES RESOURCES CO    SELLER: SOUTHLAND ROYALTY

WILSON JAMES D UNIT 2                   TX              BRAZOS
BPO WI     .000000     APO WI   .250000        BOPD         11.00
BPO NRI    .000000     APO NRI  .203333        MCFD         12.00
BPO ORRI   .000000     APO ORRI .000000        KURTEN WOODBINE
OPERATOR: BUTTES RESOURCES CO    SELLER: SOUTHLAND ROYALTY
APO ONLY
```

*Compare id.* (reproduced above, listing interests offered by Southland) *with* CR:1459 (listing another seller's wellbore interest with the notation "WELLBORE

ONLY") *and* CR:1475 (listing another seller's entire leasehold interest with the notation "LEASEHOLD").

The limited scope of interests submitted by Southland to the auction house is echoed by: (1) the discrete list of four wells at the top of the 1994 Assignment; and (2) the discrete list of four wells on Exhibit A. It is entirely reasonable to read the 1994 Assignment, including Exhibit A, as conveying only those particular interests Southland actually offered for auction and reserving to Southland all other interests it owned.

Because Burlington's interpretation of the 1994 Assignment is reasonable, the trial court erred in granting summary judgment in the PetroMax Defendants' favor. *See Coker*, 650 S.W.2d at 393-94. The only question remaining is whether reversal of the summary judgment should be accompanied by: (1) remand for further proceedings in the trial court consistent with this Court's opinion and judgment; or (2) rendition of summary judgment in Burlington's favor. This remaining question turns on whether the PetroMax Defendants' competing interpretation of the 1994 Assignment also is reasonable.

**II. If the PetroMax Defendants' interpretation also were reasonable, the resulting ambiguity would preclude summary judgment, requiring remand.**

Despite the logic and consistency with Texas law demonstrated by Burlington's interpretation, the PetroMax Defendants contend that the 1994

28

Assignment should be interpreted to convey all of Southland's interest in the Wilson, Gibbs, Buchanan, and Odom leases, except for the lands attributable to the H.K. Odom Wells, James D. Wilson #4 Well and the Buchanan #2 Well. Even if this interpretation were reasonable (*see Argument* §III(A), *infra*), it would not support summary judgment against Burlington's own reasonable interpretation. Faced with two, competing reasonable interpretations, a court cannot conclude that, given all the language, the 1994 Assignment "plainly and clearly discloses the intention of the parties." *See Madeley*, 626 S.W.2d at 731-32.

The inherent reasonableness of Burlington's interpretation is confirmed not only by the 1994 Assignment and its surrounding circumstances, but also by the fact that not one, but two, accomplished oil and gas lawyers hired by the opposing parties reached the same interpretation before any litigation arose. The PetroMax Defendants' repeated invocation of "plain language" to support their now-contrary position does not diminish the reasonableness of the earlier title opinions they themselves obtained. "[R]easonable people 'will sometimes disagree about what reasonable people can disagree about,' but even so, it is difficult to maintain that language is plain in the face of a substantial, legitimate dispute over its meaning." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 446 (Tex. 2009) (Hecht, J., concurring).

To the extent that the Court finds PetroMax Defendants' competing interpretation of the 1994 Assignment reasonable, the resulting ambiguity would preclude summary judgment. *See Coker*, 650 S.W.2d at 394. That ambiguity would require reversal of the trial court's summary judgment rulings and remand for further proceedings consistent with this Court's opinion and judgment. *Id.*

## III. However, Burlington offered the only reasonable interpretation of the applicable agreements, requiring rendition in Burlington's favor.

### A. The 1994 Assignment conveys only Southland's interest in the four enumerated wells.

In truth, however, the PetroMax Defendants' interpretation is unreasonable. Competing interpretations of a contract do not create an ambiguity unless both are reasonable. *Columbia Gas Transmission v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Because the PetroMax Defendants' interpretation is unreasonable, this Court should render judgment in Burlington's favor, ruling as a matter of law that the AMI continues in effect.

To interpret the 1994 Assignment as conveying all of Southland's interest in entire leases fails to harmonize all provisions of the contract and renders some of the contractual language meaningless. For example, reading both lists as collectively describing the conveyed interests would render meaningless the 1994 Assignment's reservation provision. *See Houchins v. Devon Energy Prod. Co., L.P.*, No. 01-08-00273-CV, 2009 WL 3321406, at *4-5 (Tex. App.—Houston [1st Dist.] Oct. 15,

30

2009, pet. denied) (mem. op.) (stating principle that an interpretation that fails to harmonize the provisions is not reasonable). This provision expressly "reserves and retains" to Southland the "certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit 'A' . . . ." CR:1029. What lands, leases, properties, interest, leasehold rights, depths or formations are specifically noted and reflected on Exhibit A? Exhibit A gives us two options: (1) the set of four leases; and (2) the set of four wells. CR:1033. No one contends that the set of four wells was reserved and retained. Such a contention would be unreasonable given that these were the same wells submitted for auction and listed at the top of the Assignment's first page. CR:1029, 1497.

That leaves only the set of leases at the top of Exhibit A to describe the reserved interests. Yet, the PetroMax Defendants contend that the reservation is limited to the narrow "exception" from the listed leases. As discussed above in Section I(B), the exception describes acreage Southland had already farmed out. *See* CR:74-75, 82-85, 501-05, 1380-81; *see also* 2SCR:14. Southland could not *reserve to itself* an interest it did not hold at the time of the Assignment, *i.e.*, "the *lands attributable to* the H.K. Odom Wells, James D. Wilson #4 Well and the Buchanan #2 Well." CR:1033 (emphasis added). On the other hand, it was logical for Southland to (1) convey its interest in the four listed wells, and (2) reserve the

31

remainder of its interest in the four listed leases, which it owned with the exception of the lands attributable to the farmed-out wells.

Reading both lists on Exhibit A as describing the interests being conveyed also would render impermissibly meaningless the list of four wells in the Assignment and on Exhibit A. *See Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991); *Coker*, 650 S.W.2d at 393; *R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518-19 (Tex. 1980). If the Assignment conveyed all of Southland's interest in the four listed leases, including interests in any wells drilled on them, there was no reason to list four of the wells included in that transfer.

It is illogical to read the title of the list of wells—*i.e.*, "Associated Wells"— to mean "the wells associated with the four above leases." For instance, the Wilson #1 well, which also was located on the Wilson Lease, is not included in the list of "Associated Wells." CR:1033. Thus, the list does not set forth the wells "associated" with the four leases, but instead identifies the wells "associated" with the sale at auction, *i.e.*, the only interests being assigned.

That the 1994 Assignment and Exhibit A afford different treatment to different wells on the Wilson Lease is entirely consistent with the surrounding circumstances. Recall that the Wilson Lease consists of two, non-contiguous tracts. The Wilson #2 and #3 wells—whose wellbores and associated production units formed the entirety of Tract 2—were included in the list of four wells being

32

conveyed. Because Southland had farmed out its interest in the Wilson #4 well, Exhibit A excepted the lands attributable to that well from the Wilson Lease interest that Southland reserved to itself. But, the Wilson #1 well was not conveyed (through the list of four wells) or carved out from the reservation (through an exception to the list of four leases).

Southland did not offer its interest in that well at auction, so it was not included in the auction catalogue, the list of wells at the top of the 1994 Assignment, or the list of "Associated Wells" in Exhibit A. Unlike the Wilson #4 well, Southland still owned its working interest in the Wilson #1, though the interest was subjected to an after-payout penalty when Southland went non-consent. Therefore, unlike the Wilson #4 well, the Wilson #1 was not included in the exception from the list of leases. As a result, Southland reserved and retained unto itself its interest in the Wilson #1 well, which it holds to this day.[11]

The PetroMax Defendants' interpretation ignores these distinctions. It would render meaningless the list of wells in the 1994 Assignment, the assignment's reservation provision, and the list of "Associated Wells" on Exhibit A.

---

[11] In addition, although the Wilson #5 well has quit producing, Burlington still owns an interest in the leasehold acreage pursuant to Humble Resources Company's re-assignment of all interest in the Wilson #5 and associated acreage after termination of its farmout agreement. CR:922-1028, 1037.

Consequently, the PetroMax Defendants' interpretation does not comply with contract construction principles and is unreasonable.

Burlington's interpretation is the only reasonable interpretation. It compels the conclusion that, as a matter of law, Burlington still jointly owns an interest in (at the very least) the Wilson #1 well, which continues the AMI in effect. Consequently, in the alternative to the remand requested above, Burlington is entitled to rendition of judgment that, pursuant to the 1975 Letter Agreement and 1994 Assignment, its ownership interest continues the AMI in effect.

### B. In addition, the 1975 Letter Agreement does not provide for reduction of Burlington's rights proportionate to the scope of its joint ownership.

Finally, in its summary-judgment motion, Burlington sought a ruling that the 1975 Letter Agreement does *not* provide for a reduction of the undivided 25% interest to be offered to Burlington in leases and mineral rights within the AMI if Burlington's joint ownership in the nine original leases diminishes over time. CR:523-26. The 1975 Letter Agreement provides that the AMI continues in effect "as long as leases are jointly owned within such area . . . ." CR:593. Upon acquiring any oil and gas leases or mineral rights within the AMI, Buttes agreed to offer to Aztec an undivided 25% interest in those leases/rights. *Id.* No provision was made for a reduction in that percentage if Aztec's (or later, Burlington's) ownership share of leases/rights within the AMI diminished over time. *Id.*

34

Had the parties wanted to provide for that reduction, they knew how to do so. The 1975 Letter Agreement does provide for a proportionate reduction in the interest required to be offered to Aztec if Buttes acquires less than the full 100% interest in an oil and gas lease or mineral rights in the AMI. CR:593. But the parties chose not to make a similar provision for any reduction in proportion to Aztec's joint ownership of leases within the AMI. Texas courts are not allowed to rewrite the agreement to add such a provision. *See, e.g.*, *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 600 n.3 (Tex. 1959).

As shown above, Burlington is entitled to reversal of the trial court's holding that the AMI provision terminated. Because Burlington offered the only reasonable interpretation regarding its undiminished right to a 25% interest in leases/rights acquired within the AMI, this Court should reverse the trial court's denial of summary judgment on that issue, as well. Further, the Court should render judgment that Burlington's rights under the 1975 Letter Agreement and AMI to the offer of a 25% interest in leases or mineral interests acquired in the AMI by Buttes' successors-in-interest are not subject to reduction or limitation based on Burlington's ownership share of leases and rights within the AMI.

**CONCLUSION AND PRAYER**

In determining whether ambiguities exist in oil and gas assignments, it is critical to analyze and apply consistently the principles that govern all contracts. The most basic policy of contract law is to protect the parties' justified expectations. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). The ability to form justifiable expectations about contractual rights and obligations depends, in turn, upon the certainty with which parties may predict how the law will interpret and enforce their agreement. *Id.* This essential legal framework is weakened by summary judgments that stray from fundamental principles governing contract construction, particularly in an area of widespread importance such as oil and gas assignments.

Appellant Burlington Resources Oil & Gas, L.P. asks this Court to reverse the trial court's summary-judgment rulings and (1) either remand the issues to the trial court for further proceedings consistent with this Court's opinion and judgment, or render judgment that the AMI continues in effect; and (2) render judgment that Burlington's rights to acquire a 25% interest in leases or mineral interests acquired by Buttes' successors-in-interest in the AMI are not subject to reduction or limitation based on the scope of Burlington's joint ownership of leases and rights within the AMI. Burlington also asks for all other relief to which it is entitled at law or in equity.

Respectfully submitted,

/s/ Kirsten M. Castañeda

John R. Mercy
 State Bar No. 13947200
 *jmercy@texarkanalawyers.com*
MERCY ✶CARTER ✶TIDWELL,
  L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503
Tel: (903) 794-9419
Fax: (903) 794-1268

Vincent L. Marable III
 State Bar No. 12961600
 *trippmarable@sbcglobal.net*
PAUL WEBB, P.C.
221 N. Houston Street
Wharton, Texas  77488
Tel: (979) 532-5331
Fax: (979) 532-2902

Kirsten M. Castañeda
 State Bar No. 00792401
 *kcastaneda@adjtlaw.com*
ALEXANDER DUBOSE
  JEFFERSON & TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, Texas 75206
Tel: (214) 369-2358
Fax: (214) 369-2359

Roger D. Townsend
 State Bar No. 20167600
 *rtownsend@adjtlaw.com*
ALEXANDER DUBOSE
  JEFFERSON & TOWNSEND LLP
1844 Harvard Street
Houston, Texas  77008
Tel: (713) 523-2358
Fax: (713) 523-4553

Fred Hagans
 State Bar No. 08685500
 *fhagans@hagans-law.com*
Kendall C. Montgomery
 State Bar No. 14293900
 *kmontgomery@hagans-law.com*
HAGANS BURDINE
  MONTGOMERY & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas  77006
Tel: (713) 222-2700
Fax: (713) 547-4950

*Attorneys for Appellant*
*Burlington Resources Oil & Gas Company LP*

**CERTIFICATE OF COMPLIANCE**

I certify pursuant to TEX. R. APP. P. 9.4(i)(3) that this Brief complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.    Exclusive of the contents identified by Rule 9.4(i)(1) and inclusive of all textboxes, footnotes, and endnotes, this Brief contains   7,543   words  as  counted by the Word Count function of Microsoft Word 2010.

2.       This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Word 2010
Typeface Name: Times New Roman
Font Size: 14 point

/s/ Kirsten M. Castañeda
Kirsten M. Castañeda

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of October, 2015, a true and correct copy of the foregoing Brief, including Appendix and hyperlinked materials, is served on Appellee by e-mail and e-service via efile.txcourts.gov to counsel of record as described below:

Mr. Brad D'Amico
*bd@canteyhanger.com*
CANTEY HANGER LLP
1999 Bryan Street, Suite 3300
Dallas, Texas 75201

*Counsel for Appellee PetroMax Operating Co., Inc.*

Mr. Greg W. Curry
*Greg.Curry@tklaw.com*
Mr. Gregory D. Binns
*Gregory.Binns@tklaw.com*
Mr. Richard B. Phillips, Jr.
*Rich.Phillips@tklaw.com*
THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201

*Counsel for Appellee Woodbine Acquisition, LLC n/k/a MD America Energy LLC*

Mr. David J. Beck
*dbeck@beckredden.com*
Mr. Thomas E. Ganucheau
*tganucheau@beckredden.com*
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010

*Counsel for Appellees PetroMax Operating Co., Inc., Petro Texas LLC, and CH4 Energy II, LLC*

Mr. Jesse R. Pierce
*JPierce@pierceoneill.com*
Mr. Brian K. Tully
*BTully@pierceoneill.com*
PIERCE & O'NEILL, LLP
4203 Montrose Blvd.
Houston, Texas 77006

*Counsel for Appellee TexCal Energy South Texas, LP*

/s/ Kirsten M. Castañeda
Kirsten M. Castañeda

No. 06-15-00044-CV

---

## IN THE SIXTH DISTRICT COURT OF APPEALS

---

**Burlington Resources Oil & Gas Company LP,** *Appellant,*

**v.**

**PetroMax Operating Co., Inc., Woodbine Acquisition, LLC,
Petro Texas, LLC, Ch4 Energy II, LLC, and
Texcal Energy South Texas L.P.,** *Appellees.*

---

On Appeal from the 12th Judicial District Court
Madison County, Texas, Cause No. 12-13130-012-10

---

APPENDIX TO BRIEF FOR APPELLANT

---

Tab

1975 Letter Agreement (CR:589-625).................................................................... 1

1994 Assignment and Bill of Sale (CR:1029-34).................................................... 2

Order Granting Defendants' Motion for Summary Judgment on Title
Issues (CR:1617)..................................................................................................... 3

Order Denying Burlington's Motion for Partial Summary Judgment
Seeking Various Declarations (CR:1618-19) .......................................................... 4

Order on Joint Motion to Sever and Abate (CR:1640-45) ..................................... 5

# Tab 1

Tab 1

# BUTTES RESOURCES COMPANY

SOUTHWEST DIVISION
1100 MILAM
SUITE 733
HOUSTON, TEXAS 77002
(713) 223-1414

TELEX
762297

MAILING ADDRESS
P. O. BOX 2067
HOUSTON, TEXAS 77001

January 7, 1975

Mr. Thomas E. Scott
Aztec Oil & Gas Company
2000 First National Bank Building
Dallas, Texas 75202

Re: Drilling and Joint Operating
Agreement - Aztec Oil &
Gas Company
00-660 - So. Zulch Prospect
Madison, Brazos and Grimes
Cos., Texas

Dear Mr. Scott:

Buttes Resources Company (hereinafter referred to as "BRC") owns an undivided one-half (1/2) working interest in and to the oil and gas leases described and referred to in Exhibit "A" attached hereto and made a part hereof, which leases and the lands covered thereby are referred to herein as "said leases". You have expressed a desire to participate with BRC in the drilling of a test well in search of oil or gas subject to the terms and conditions hereinafter contained, and this letter, when accepted by you in the space hereinbelow provided, shall set forth the terms of our agreement concerning the drilling of such test well and the operation and development of said leases.

## I.

Prior to commencing drilling operations of the test well, BRC shall cause title to the tract of land upon which such test well is to be drilled to be examined by an attorney of its choice.

## II.

BRC agrees to furnish you the following information:

A. A plat on which said leases and the proposed location of the test well are noted.



EXHIBIT
2



EXHIBIT
2

589

B.  The estimated cost of drilling the test well to 9,200 feet, including the cost of all open hole logging which will be conducted. Such estimated costs are set forth on the authorization for expenditure (AFE) attached hereto as Exhibit "B" and by this reference made a part hereof.

C.  Copies of said leases and all other pertinent legal documents. Aztec shall have a period of ten days after receipt of said title material within which to accept or reject the said leases. If Aztec rejects title to said leases, it shall point out to BRC the deficiencies upon which such rejection is based and BRC, at its option, shall have a period of sixty days after receipt of such advice from Aztec within which to cure such defects in title to Aztec's satisfaction. In the event such defects are not so cured within said sixty-day period, Aztec may withdraw from this agreement and all obligations hereunder between Aztec and BRC shall be terminated.

D.  A copy of the title opinion covering the lease or tract upon which the test well is to be drilled setting forth the fee ownership of the minerals and the ownership of the oil and gas lease covering such mineral interests, based upon abstracts of title or a search of the county records and approving title into BRC for drilling and production. No well shall be commenced under this agreement However, until Aztec has approved title to the drillsite lease or tract.

III.

Subject to all other terms and provisions hereof, BRC agrees to commence or cause to be commenced, at the earliest possible date, operations for the drilling of a test well in search of oil or gas at a mutually agreeable location on said leases. Such test well shall be drilled with due diligence and in a good and workmanlike manner to a depth of 9,200 feet beneath the surface of the earth, whichever is the lesser depth, herein called the "objective depth", unless some "impenetrable", as that term is defined below, is encountered prior to reaching the objective depth. The term "impenetrable" as used in this agreement shall mean formations or conditions which would render further drilling operations by a prudent operator impracticable or which cannot be penetrated by the use of customary drilling procedure or techniques.

If an impenetrable is encountered prior to reaching the objective depth, the provisions of Section 31 C of the Joint Operating Agreement attached hereof as Exhibit "C" shall become effective.

Upon reaching the objective depth for the test well, BRC shall cause such logs and tests to be made which are mutually agreed upon.

## IV.

Your representative shall be allowed free access to the derrick floor and to any and all information, geological or otherwise, pertaining to the drilling of the test well. Prior to running any logging device, coring or taking any formation tests, or other similar type test, BRC shall first give you notice in sufficient time to allow your representative to be present to witness such test. BRC agrees to furnish you two (2) copies of each field print and two (2) copies of each final print of electric logs and shall telephone daily reports to your representative. Any notice required hereunder to be given to BRC shall be furnished to:

> Buttes Resources Company
> Attention: Mr. V. K. Kraus
> 1100 Milam Building, Suite 733
> P. O. Box 2067
> Houston, Texas  77001
> Office Phone:  (713) 223-1414
> Home Phone:  (713) 682-7327

Any notice required hereunder to be given by BRC to you shall be furnished to:

> Aztec Oil & Gas Company
> 2000 First National Bank Bldg.
> Dallas, Texas  75202
> DRILLING REPORTS & GEOLOGICAL NOTICES:
> Attention:  Mr. Kenneth A. Wood
> Office Phone:  (214) 741-1272
> Home Phone:  (214) 254-8090
>   or
> Mr. R. K. Taylor
> Office  (214) 741-1272

## V.

In consideration of BRC's agreement to drill the test well described above you agree to bear and pay the costs, risks and expenses incurred in drilling and testing prior to the running of production casing for a completion    attempt and plugging and abandoning if no completion is attempted on such test well as set out below. Except as otherwise in this agreement provided, such payment shall be due and payable on or before thirty days after you receive invoices for the same.

A. 33-1/3% of all of BRC's costs, risks and expenses incurred in drilling and testing for the test well and in plugging the well if no completion attempt is made.

B.   $46,331.50 as your share of the acquisition costs paid by BRC
     for said leases, including brokerage and recording costs incur-
     red in connection with the acquisition of the same as of the
     date hereof.

C.   Subject to the terms of the Joint Operating Agreement Exhibit
     "C" hereto, 25% of all costs incurred after the date hereof,
     including, without limitation, rentals, curative work, out-
     side legal costs and costs of governmental regulatory
     applications and hearings in connection with said leases.

All of the costs, risks and expenses incurred in drilling, testing,
completing, etc. shall be supported by invoice or statements of charges,
copies of which BRC agrees to make available upon request. Such costs,
risks and expenses shall be invoiced to you when BRC receives invoices
for the same.

## VI.

Subject to the provisions of Paragraph VII, Upon receipt of payment
of your share of the costs and expenses set out in Paragraph V-B, which
you have agreed to pay herein, BRC agrees to assign to you, with warranty
of title, by, through and under BRC but not otherwise, an undivided 25%
interest in said leases. Such assignment shall be subject to the terms
of this agreement, the Joint Operating Agreement attached hereto as
Exhibit "C", (by this reference made a part hereof), and your proportion-
ate part of the Lessors' royalty provided for in said leases and the
over-riding royalty provided for in Exhibit "E" hereto. It is understood
and agreed that all operations conducted after the test well has been
drilled to the objective depth or plugged and abandoned as a dry hole
if no completion is attempted shall be conducted under the terms of the
Operating Agreement attached hereto as Exhibit "C", with your interest
therein being an undivided one-fourth (1/4).

## VII.

If any rental shall become due after the date hereof and prior to
the Joint Operating Agreement attached hereto as Exhibit "C" becoming
effective under any of said leases, then BRC shall pay the same and you
agree to reimburse BRC for 25% of such rental payment within thirty days
after receipt of BRC's invoice; provided, BRC shall not be liable for
erroneous payment or inadvertent failure to pay any such rental.

## VIII.

It is not the purpose or intention of this agreement to create, nor shall the same be construed as creating any mining partnership, commercial partnership or other partnership relation nor shall the operations of the parties hereunder be construed to be considered as a joint venture. The liability of the parties hereto shall be several and not joint or collective.

Each of the parties hereto elects, under the authority of Section 761 (a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. If applicable, BRC is hereby authorized to execute and file on behalf of both parties hereto such elections with the appropriate governmental agencies.

## IX.

Exhibit "D" denotes an Area of Mutual Interest, outlined in red. If you acquire any oil and gas leases or mineral rights within the Area of Mutual Interest after the date hereof, then you agree to offer to BRC an undivided three-fourths (3/4) interest in said leases or mineral interest so acquired; and if BRC accepts said interest, then BRC will immediately reimburse you for its proportionate part of the acquisition costs. If BRC acquires any oil and gas leases or mineral rights within the Area of Mutual Interest after the date hereof, then BRC agrees to offer to you an undivided one-fourth (1/4) interest in said leases or mineral interest so acquired; and if AZTEC accepts said interest, then AZTEC will immediately reimburse BRC for its proportionate part of the acquisition costs.* Such offer or offers are to be made in writing and offeree shall have fifteen (15) days in which to accept or reject such offer. If either so acquires an oil or gas lease or mineral interest and the other party does not desire to participate in such acquisition, then the acquiring party shall own said oil and gas lease or mineral interest free and clear of all terms and conditions of this agreement. If both parties participate in such acquisition, then the oil and gas lease or mineral interest shall be subject to the terms and conditions of the Joint Operating Agreement attached hereto as Exhibit "C". If the interest in oil and gas leases or mineral rights acquired represents less than the full 100% interest in such interest, then the rights of the parties hereunder to acquire such interest shall be proportionately reduced. The Area of Mutual Interest as outlined in Exhibit "D" shall last as long as leases are jointly owned within such area, however,

*In the event an interest in oil and/or mineral rights is acquired by BRC pursuant to that certain Letter Agreement dated October 16, 1974, between Buttes Resources Company and Curran R. Campbell, then BRC agrees to offer to AZTEC one-half (1/2) of the interest so acquired by BRC and if AZTEC accepts said interest, then AZTEC shall immediately reimburse BRC for its proportionate part of BRC's actual acquisition costs.

three years from the date of this agreement, if said area is still in
effect, it shall be contracted to an area/by a line two miles outside
the then remaining jointly owned leases.

## X.

The terms, covenants and conditions hereof shall extend to and be
binding upon the parties hereto, their successors and assigns. This
instrument shall not be assigned by you either in whole or in part
unless you have first obtained written consent from BRC. In the event
that you are acquiring this undivided working interest for the account
of more than one (1) person or entity, then you represent that you
have sole investment discretion to purchase such interest for such
accounts.

## XI.

It is mutually understood that there is no obligation upon BRC
to commence a well under the terms of this agreement and there shall
be no penalty for failure to commence such well; however, BRC shall
make its best effort to commence the drilling of the well at the
earliest possible date. However, in the event BRC does not commence
the test well herein provided for within one year from the date of this
agreement:

1.    Then this Agreement, at Aztec's option (which shall be exercised
      within 30 days after the end of one year from the date hereof),
      shall terminate and be of no further force and effect. In the
      event Aztec elects to so terminate this agreement, then BRC
      shall refund to Aztec the amount of money which Aztec has
      paid to BRC as of the date of such termination plus $2,500,00,
      being the finders fee which Aztec has paid to Mr. Bill Richardson,
      and Aztec, upon receipt of such payment, shall reassign to BRC
      its interest in this agreement and in the said leases.

## XII.

This agreement and the Operating Agreement attached hereto are
both subject to the terms and conditions of the Letter Agreement dated
September 4, 1974, between Curran R. Campbell, Inc. and W. A. Nowotny
and the Assignment of Oil, Gas and Mineral Leases dated October 18,
1974, from Curran R. Campbell, Inc. to Buttes Resources Company, both
attahced hereto as Exhibits "E" and "F", respectively.

The foregoing sets forth the entire agreement between the parties,
and there are no verbal or oral agreements between the parties not set
out herein in writing. If either party desires to amend this agreement,
then such amendment shall be accomplished by an instrument in writing
executed by both parties hereto.

If the terms and conditions herein set forth meet with your approval, please indicate your approval and acceptance by signing this agreement in the space provided below and returning one (1) fully executed original of this agreement to Buttes Resources Company, P. O. Box 2067, Houston, Texas, 77001 - Attention: Mr. John D. Fulton.

If this agreement is not signed and returned within fifteen (15) days form your receipt hereof, then this agreement, at BRC's option, shall terminate and be of no force and effect.

This agreement has been executed in duplicate, each of which shall constitute an origianl.

                                        Very truly yours,

                                        BUTTES RESOURCES COMPANY

                                        BY: _Roger C. Chapman_
                                            ROGER C. CHAPMAN
                                            VICE PRESIDENT

JDF/RCC/mjw
Attachments

AGREED TO AND ACCEPTED THIS __8th__ DAY OF
__JANUARY__, 19_75_ .

AZTEC OIL & GAS COMPANY

BY: _Kenneth A. Swanson_
       Vice President

595

Exhibit "A" to Letter Agreement dated 12-1-74
between Buttes Resources Company and Aztec Oil & Gas Company

| LESSOR | LESSEE | RECORDED VOLUME - PAGE |
|--------|--------|------------------------|
| A.Y. Benge et ux | Curran R. Campbell, Inc. | 203 - 459 - Madison County |
| J. Philip Gibbs, Jr., Attorney | Curran R. Campbell, Inc. | 203 - 414 - Madison County |
| Faye Andrews | Curran R. Campbell, Inc. | 203 - 411 - Madison County |
| T.L. Hurry et ux | Curran R. Campbell, Inc. | 203 - 409 - Madison County |
| James D. Wilson, Ind. & Ind. Ex. | Curran R. Campbell, Inc. | 21 - 667 - Brazos County |
| Henry K. Odom et ux | Curran R. Campbell, Inc. | 21 - 661 - Brazos County |
| George W. Boswell et al | Curran R. Campbell, Inc. | 203 - 858 - Madison County |
| B.J. Cooley et ux | Curran R. Campbell, Inc. | 203 - 856 - Madison County |
| Raymond B. Buchanan et ux | Curran R. Campbell, Inc. | 21 - 679 - Brazos County |

A.A.P.L. FORM 610

# MODEL FORM OPERATING AGREEMENT—1956
Non-Federal Lands

## OPERATING AGREEMENT

### DATED

January 7        75
~~December 1~~        , 19~~74~~,

FOR UNIT AREA IN TOWNSHIP_____, RANGE_____,

Counties
Madison, Brazos & Grimes____ ~~COUNTIES~~, STATE OF____Texas_____.

South Zulch Area

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.                    A.A.P.L. NO. 610
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
ROSS - MARTIN COMPANY,    BOX 800, TULSA  74101

Exhibit "C" to Agreement between Buttes Resources Company and Aztec Oil & Gas Company,
dated ~~December 1, 1974.~~
January 7, 1975

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Selection of New Operator | 8 |
| 20. | Maintenance of Unit Ownership | 9 |
| 21. | Resignation of Operator | 9 |
| 22. | Liability of Parties | 9 |
| 23. | Renewal or Extension of Leases | 9 |
| 24. | Surrender of Leases | 10 |
| 25. | Acreage or Cash Contributions | 10 |
| 26. | Provision Concerning Taxation | 10 |
| 27. | Insurance | 11 |
| 28. | Claims and Lawsuits | 11 |
| 29. | Force Majeure | 11 |
| 30. | Notices | 11 |
| 31. | Other Conditions | 12 |

## OPERATING AGREEMENT

THIS AGREEMENT, entered into this___1st___ day of, December_____ , 19_74_., between

Buttes Resources Company_____

hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

### 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

### 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

Prior to the commencement of any well, operator shall cause title to be examined on the drilling unit and a title opinion prepared by a competent attorney of his choice. Operator shall submit copies of the title opinion to all parties who are to participate in the drilling of such well and such well shall not be commenced until all such parties have approved title to the drilling unit.

— 1 —

"Joint Loss"

~~obligations and of excess royalty, oil payments, and other special burdens. A copy of each title opinion, and~~ of each supplemental opinion, and of all final opinions, shall be sent promptly to each party. The opinion of the examining attorney concerning the validity of the title to each oil and gas interest and each lease, and the amount of interest covered thereby shall be binding and conclusive on the parties, but the acceptability of leases as to primary term, royalty provisions, drilling obligations, and special burdens, shall be a matter for approval and acceptance by an authorized representative of each party.

All title examinations shall be made, and title reports submitted, within a period of_____days after the submission of abstracts and title papers. Each party shall, in good faith, try to satisfy the requirements of the examining attorneys concerning its leases and interests, and each shall have a period of_____ days from receipt of title report for this purpose. If the title to any lease, or oil and gas interest, is finally rejected by the examining attorney, all parties shall then be asked to state in writing whether they will waive the title defects and accept the leases or interests, or whether they will stand on the attorney's opinion. If one or more parties refuse to waive title defects, this agreement shall, in that case, be terminated and abandoned, and all abstracts and title papers shall be returned to their senders. If all titles are approved by the examining attorneys, or are accepted by all parties, and if all leases are accepted as to primary terms, royalty provisions, drilling obligations and special burdens, all subsequent provisions of this agreement shall become operative ~~immediately, and the parties shall proceed to their performance as they are hereinafter stated.~~

## B. Failure of Title:

~~After all titles are approved or accepted,~~ Any defects of title that may develop shall be the joint responsibility of all parties and, if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If such a loss occurs, there shall be no change in, or adjustment of, the interests of the parties in the remaining portion of the Unit Area.

## C. Loss of Leases For Other Than Title Failure:

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the Unit Area.

## ~~3. UNLEASED OIL AND GAS INTERESTS~~

~~If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for~~ the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns ~~the lessee interest.~~

## 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —

"Joint Loss"

If the interest of any party in any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eigthh (⅛) royalty, such party shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

    __Buttes Resources Company__ _____shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

~~7. TEST WELL~~

On or before the_____ day of_____, 19_____, Operator shall commence the drilling of a well for oil and gas in the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance is encountered at a lesser depth or unless all parties agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the ~~well shall then be plugged and abandoned as promptly as possible.~~

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of ~~six~~ ten percent ~~(6%)~~ (10%) per annum until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

## 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise. provided, however, that in the event the first well drilled hereunder results in a dry hole and no other well is producing oil or gas in paying quantities from the Unit Area, then at the end of ninety (90) days after abandonment of the first test well, this agreement shall terminate unless one or more of the parties are then engaged in drilling a well or wells pursuant to Section 12 hereof, or all parties have agreed to drill an additional well or wells under this agreement, in which event this agreement shall continue in force until such well or wells shall have been drilled and completed. If production results therefrom this agreement shall continue in force thereafter as if said first test well had been productive in paying quantities, but if production in paying quantities does not result therefrom this agreement shall terminate at the end of ninety (90) days after abandonment of such well or wells. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of    Ten Thousand and no/100-------------------------------------- Dollars ($ 10,000.00   ) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ 5,000.00   .

— 4 —

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area ~~other than the~~ ~~test well provided for in Section 7~~, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours ~~exclusive of Saturday or Sunday~~) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within ~~thirty (30)~~ ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) ~~100%~~ 600% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus ~~100%~~ 600% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) ~~200%~~ 600% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 25, and ~~200%~~ 600% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

— 5 —

*603*

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

### 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

— 6 —

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.

## 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

— 7 —

Operator shall pay all delay rentals and shut-in well payments which may be required under the terms of all leases covered by this agreement and submit evidence of each payment to the other parties. Each party shall notify the other, in writing, at least thirty (30) days prior to the date any rental payment is due, as to whether or not it elects to participate in the payment thereof. In the event either party elects not to participate in a rental payment, and the other party elects to participate therein, then the party desiring not to participate shall promptly execute and deliver to the party desiring to participate in such rental payment an assignment of such non-participating party's right, title and interest in and to such lease, or leases, and such lease, or leases, shall no longer be subject to this agreement. The amount of such payments, when made for the account of both parties, shall be charged by Operator to the joint account of the parties. Operator shall not be liable to the other party in damages for the loss of any lease or interest therein if, through mistake or oversight, any rental or shut-in well payment is not paid, or is erroneously paid. There shall be no readjustment of interests of the parties in the remaining portion of the Unit Area in the event of a failure to pay, or erroneous payment of, rental or shut-in well payments. If any party secures a new lease covering the terminated interest, such acquisition shall be subject to the provisions of paragraph 22 of this agreement.

Operator shall promptly notify each other party hereto of the date on which any gas well located on the Unit Area is shut in and the reason therefor and the date on which said well is restored to production.

18. PREFERENTIAL RIGHT TO PURCHASE

Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

## 19. SELECTION OF NEW OPERATOR

Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

## 20. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 21. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties. In this case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 22. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 23. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

— 9 —

## 24. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## 25. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

## 26. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C". The above two paragraphs are subject, however, to paragraph 31-B.

— 10 —

## 27. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

## 28. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

## 29. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 30. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## 31. OTHER CONDITIONS, IF ANY, ARE:

(a)  If any party hereto hereafter should create any overriding royalty, production payment, or other burden against its working interest production and if any other party or parties should conduct nonconsent operations pursuant to any provisions of this agreement and, as a result, become entitled to receive the working interest production otherwise belonging to the non-participating party, the party or parties entitled to receive the working interest production of the non-participating party shall receive such production free and clear of burdens against such production which may have been created subsequent to this agreement and the non-participating party creating such subsequent burdens shall save the participating party or parties harmless with respect to the receipt of such working interest production.

(b)  At and during such time, or times, as non-operator is exercising the right to take in kind or separately dispose of its proportionate part of the production as set forth in Section 13 hereof, non-operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such part.  At and during such time, or times, as Operator is purchasing or selling non-operator's proportionate part of the production as set forth in said Section 13, Operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such part.

(c)  Notwithstanding any provision to the contrary appearing elsewhere herein, consent to the drilling of a well shall not be deemed as consent to the setting of casing and a completion attempt.  After any well drilled pursuant to this agreement has reached its authorized depth, or an impenetrable is encountered as set out in Paragraph III of the letter agreement dated December 1, 1974, to which this Operating Agreement is attached, Operator shall give immediate notice to non-Operators together with all information and data obtained in the drilling of such well up to such time.  Concurrent therewith Operator shall also advise non-Operators of his recommendation, decision or intent respecting further operations. The parties receiving such notice, information, data and advice shall have forty-eight (48) hours in which to elect whether or not they desire to set casing and to participate in the completion attempt.  Failure of a party receiving such notice so to reply within the period above fixed shall constitute an election by that party not to participate in the cost of a completion attempt.  If all of the parties elect to plug and abandon the well, Operator shall plug and abandon same at the expense of all of the parties.  If one or more, but less than all of the parties elect to set pipe and attempt a completion, the provisions of Section 12 shall apply to the operations thereafter conducted by less than all parties.



This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

OPERATOR

ATTEST:

_____

Buttes Resources Company

By _R̶o̶g̶e̶r̶ C. Chapman_
Roger C. Chapman
Vice-President

NON-OPERATOR

_____

Aztec Oil & Gas Company

By _Kenneth A. Swanson_
Vice President

ATTEST:

_____
Assistant Secretary

_____

THE STATE OF TE.                   X
                                   X
COUNTY OF HARRIS                   X

BEFORE ME, the undersigned authority, on this day personally appeared ROGER C. CHAPMAN, known to me to be the person whose name is subscribed to the foregoing instrument as Vice President of BUTTES RESOURCES COMPANY, a corporation, and acknowledged to me that he executed the same as the act and deed of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 1st day of _____, 19 94.

SHARON S. SIMMONS
Notary Public In and for Harris County, Texas
My Commission Expires June 1, 19 75

Notary Public in and for
Harris County, Texas

THE STATE OF TEXAS      X
                        X
COUNTY OF DALLAS        X

BEFORE ME, the undersigned, a Notary Public, in and for said County and State, on this day personally appeared Kenneth G. Swanson, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said AZTEC OIL & GAS COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 8th day of _____, 19 75.

Notary Public in and for
Dallas County, Texas

SUE ELLEN PERRY, Notary Public
In and for Dallas County, Texas
My Commission Expires June 1, 1975.

612

EXHIBIT "A"

Attached to and made a part of Operating
Agreement with Buttes Resources Company
as Operator.

When this Operating Agreement becomes effective, as to a particular
Well, Exhibit "A" shall be prepared, listing all working interest owners,
their percent of interest and the specific lands designated for such well.

EXHIBIT "B"


Attached to and made a part of Operating
Agreement with Buttes Resources Company
as Operator.



There is no Exhibit "B".

EXHIBIT 601 ROSS-MARTIN COMP TULSA, OKLAHOMA 7




COPAS — 1968
Recommended by the Council of Petroleum Accountants Societies of North America

# EXHIBIT " C "

Attached to and made a part of __Operating Agreement__

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall be defined as set forth under the subparagraph selected below:

A. [ ] Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

B. [X] Material which is ordinarily so classified and controlled by Operator in the conduct of its operations. List shall be furnished Non-Operators upon request.

### 2. Statements and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses for the preceding month. Such bills will be accompanied by statements reflecting the total charges and credits as set forth under the subparagraph selected below:

A. [ ] Statement in detail of all charges and credits to the Joint Account.

B. [X] Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.

C. [ ] Statement of all charges and credits to the Joint Account, summarized by appropriate classification indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of ten per cent (10%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.

### 5. Audits

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of Non-Operators is expressly required under Paragraphs 5A, 5B, 6A and 8 of Section II, Section III, Section V, Section VI, and Paragraph 4 of Section VII, of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the Operator shall notify all Non-Operators and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of first-level supervisors in the field if such charges are excluded from overhead rates in Option A of Section III.

   (3) Salaries and wages of technical employees temporarily assigned to and directly employed on the Joint Property if such charges are excluded from overhead rates in Option B of Section III.

   (4) Salaries and wages of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from overhead rates in Option C of Section III.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph IA of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1A of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1A of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III.

   D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

3. **Employee Benefits**

   Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1A of Section III shall be chargeable as indicated in the subparagraph selected below:

   A. [ ] Operator's actual cost.

   B. [X] Operator's actual cost not to exceed fifteen per cent (15%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by Operator and Non-Operators.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by Operators and Non-Operators. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by Operator and Non-Operators.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

6. **Services**

   A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 1B of Section III. The cost of professional consultant services shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

   B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

7. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

8. **Legal Expense**

   All costs and expenses of handling, investigating, and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorney's fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III), unless agreed to by Operator and Non-Operators, and (b) no charge shall be made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

9. **Taxes**

   All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

— 2 —

10. **Insurance**

Net premiums paid for insurance required to be carried on the Joint Property for the protection of the Parties.

In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge therefor on the following basis:

_____ Refer to Exhibit "D" following the Accounting Procedure _____

11. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

## III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus the rate for administrative overhead, and plus the warehousing charges, all as provided for in Paragraph 1 of this Section III or by combining all three of said items under the rates provided for in Paragraph 2 or 3 of this Section III, as indicated next below:

**OPERATOR SHALL CHARGE INDIRECT COSTS TO THE JOINT ACCOUNT UNDER THE TERMS OF:**

[ ] Paragraph 1. (District Expense, Administrative Overhead and Warehousing)
[X] Paragraph 2. (Combined Rates – Well Basis)
[ ] Paragraph 3. (Combined Rates – Percentage Basis)

The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by Operator and Non-Operators as a direct charge to the Joint Account.

**THE OVERHEAD RATES PROVIDED FOR IN ANY OF THE PARAGRAPHS SELECTED ABOVE**

A. [ ] shall [X] shall not include salaries and personal expenses of first-level supervisors in the field.
B. [ ] shall [X] shall not include salaries, wages and personal expenses of technical employees temporarily assigned to and directly employed on the Joint Property.
C. [X] shall [ ] shall not include salaries, wages and personal expenses of technical employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property.

1. **District Expense, Administrative Overhead and Warehousing**

   A. **District Expense**

   Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's _____ _____ office located at or near _____ (or a comparable office if location changed); and necessary sub-offices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

   B. **Administrative Overhead**

   Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1A of this Section III, including salaries, wages and expenses of personnel assigned to such offices. Such charge shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged direct as provided in Paragraphs 2 and 8 of Section II. Such charge shall be made on the basis indicated below, either (1) well basis or (2) percentage basis, at the rates shown thereunder.

   (1) [ ] Well Basis

## RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

   (2) [ ] Percentage Basis

## PERCENTAGE BASIS

Development:

_____ Percent ( %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

Operating:

_____ Percent ( %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

— 3 —

C. Operator's Warehouse Operating and Maintenance Expense
[ ] Included in district expense
[ ] No charge either direct or indirect
[ ] Percentage basis (describe fully) .................................................................................
.................................................................................
.................................................................................

2. Combined Rates - Well Basis
Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### RATE PER WELL PER MONTH

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| All Depths | $1650 | $296 | 263 | 230 |
| | | | | |
| | | | | |
| | | | | |

3. Combined Rates - Percentage Basis
Operator shall charge the Joint Account for the services covered by Paragraph 1 of this Section III on the basis indicated below:

### PERCENTAGE BASIS

A. Development:
.................. Percent (    %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 8 of Section II and all salvage credits.

B. Operating:
.................. Percent (    %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 1 and 8 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

4. Application of Administrative Overhead or Combined Rates - Well Basis
The following limitations, instructions and charges shall apply in the application of the rates as provided under either Paragraph 1B (1) or Paragraph 2 of this Section III.
A. Charges for drilling wells shall begin on the date each well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.
B. The status of wells shall be as follows:
(1) Producing gas wells, injection wells for recovery operations, water supply wells utilized for waterflooding operations and salt water disposal wells shall be considered the same as producing oil wells.
(2) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected. Any well being plugged or produced during any portion of the month shall be considered as a producing well for the entire month.
(3) Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling rig or workover rig capable of drilling shall be considered the same as drilling wells.
(4) Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property. In the event of a unit allowable, shut-in wells shall be counted in determining the charge hereunder for such month if said wells contribute allowable production that is actually produced during such month from one or more unit wells as a result of allowable transfer, inclusion in the unit allowable or other circumstances, but the total shut-in well count shall be limited to the minimum number of shut-in wells necessary to provide the contributed allowable actually produced during the month.
(5) Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.
(6) Wells completed in multiple horizons, shall be considered as a producing well for each separately producing horizon, providing each completion is considered a separate well by governmental or other state-wide regulatory authority.
C. The well rates for producing wells shall be applied to the individual leases; provided that, whenever leases covered by this agreement are operated as a unitized project, the well rates shall be applied to the total number of producing wells, irrespective of individual leases.
D. The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year as shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian Index as published by the Dominion Bureau of Statistics, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

5. Application of Administrative Overhead or Combined Rates - Percentage Basis
For the purpose of determining charges on a Percentage Basis under Paragraph 1B (2) or Paragraph 3 of this Section III, Development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when well is not completed as a producer; and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 6 of this Section III. All other costs shall be considered as Operating.

6. Major Construction Overhead
For the construction of compressor plants, water stations, secondary recovery systems, drilling and production platforms, salt water disposal facilities, and other such projects, as distinguished from the more usual drilling

— 4 —

and producing operations, Operator in addition to the Administrative Overhead or Combined Rates provided for in Paragraph 1, 2 or 3 of this Secton III shall either negotiate a rate prior to beginning of construction or shall charge the Joint Account with an additional overhead charge as follows:

A. Total cost less than $25,000, no charge.

B. Total cost more than $25,000, but less than $100,000, ......3.........% of total cost.

C. Total cost of $100,000 or more, .......3........ % of the first $100,000 plus ......2........ % of all over $100,000 of total cost.

Total cost shall mean the total gross cost of any one project. For the purpose of this paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

7. **Amendment of Rates**

The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operators may supply Material or services for the Joint Property.

1. **Purchases**

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

2. **Material furnished from Operator's Warehouse or Other Properties**

A. New Material (Condition "A")

(1) Tubular goods, except line pipe, shall be priced on a maximum carload and/or barge load weight basis regardless of quantity transferred and equalized to the lowest prevailing price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available effective at date of transfer.

(2) Line pipe shall be priced at the current replacement cost effective at date of transfer from a reliable supply store nearest the Joint Property where such Material is normally available if the movement is less than 30,000 pounds. If the movement is 30,000 pounds or more, it shall be priced on the same basis as casing and tubing under Subparagraph (1) of this paragraph.

(3) When the Operator has equalized actual hauling costs as provided for in Paragraph 5 of Section II, Operator is permitted to include ten cents (10¢) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(4) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is normally available.

(5) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B. Used Material (Condition "B" and "C")

(1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2) Material which is not suitable for its original function until after reconditioning shall be furnished to the Joint Account under one of the two methods defined below:

(a) Classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material. The cost of reconditioning shall be absorbed by the Operator of the transferring property.

(b) Classified as Condition "C" and priced at fifty per cent (50%) of current price of new Material. The cost of reconditioning also shall be charged to the receiving property, provided Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing. Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

5. **Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. In lieu of rates based on costs of ownership and operation of equipment, other than automotive, Operator may elect to use commercial rates prevailing in the area of the Joint Property less 20%; for automotive equipment, rates as published by the Petroleum Motor Transport Association may be used. Rates for laboratory services shall not exceed those currently prevailing if performed by

— 5 —

outside service laboratories. Rates for trucks, tractors and well service units may include wages and expenses of operator.

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to charge.

C. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, shall be agreed to by Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk and scrap Material either by transfer or sale from Joint Property.

1. **Material Purchased by the Operator or Non-Operators.**

   Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Account for the month in which the Material is removed by the purchaser.

2. **Division in Kind**

   Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respective interests in such Material. The Parties will thereupon be charged individually with the value of the Material received or receivable. Proper credits shall be made by the Operator to the Joint Account.

3. **Sales to Outsiders**

   Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at the net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged back to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless agreed to by Operator and Non-Operators shall be priced on the following basis:

1. **New Price Defined**

   New price as used in this Section VI shall be the price specified for new Material in Section IV.

2. **New Material**

   New Material (Condition "A"), being new Material procured for the Joint Property but never used, at one hundred per cent (100%) of current new price (plus sales tax if any).

3. **Good Used Material**

   Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reuse without reconditioning:

   A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new, or

   B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Account as secondhand at seventy-five per cent (75%) of new price.

4. **Other Used Material**

   Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:

   A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or

   B. Is serviceable for original function but not suitable for reconditioning.

5. **Bad-Order Material**

   Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable for some other purpose at a price comparable with that of items normally used for such other purpose.

6. **Junk Material**

   Junk Material (Condition "E"), being obsolete and scrap Material, at prevailing prices.

7. **Temporarily Used Material**

   When the use of Material is temporary and its service to the Joint Property does not justify the reduction in price as provided for in Paragraph 3B of this Section VI, such Material shall be priced on a basis that will leave a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

   At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

   Reconciliation of inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable to Non-Operators only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

   Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by Operator and Non-Operators.

— 6 —

EXHIBIT "D"

Attached to and made a part of that certain
Operating Agreement dated December 1  , 1974,
between ~~Buttes Gas & Oil Co.~~ Buttes Resources Company , Operator, and
Aztec Oil & Gas Company         , Non-Operators.

As to all operations hereunder, Operator shall carry insurance
for the benefit and protection of the parties hereto as follows:

(a)  Workmen's Compensation Insurance as contemplated
by the laws of the State of Texas and including
an Employer's Liability limit of $100,000 each
accident.

(b)  Comprehensive General Liability Policy with
Bodily Injury limits of $100,000 each person
and $300,000 each occurrence, and a Property
Damage limit of $100,000 each occurrence and
subject to an aggregate limit of $100,000.

(c)  Comprehensive Automobile Policy covering all
owned, non-owned and hired automobiles for
Bodily Injury limits of $100,000 each person
and $300,000 each occurrence, and a Property
Damage limit of $100,000 each occurrence.

(d)  Umbrella Liability providing a $1,000,000
Combined Single limit as excess of the Bodily
Injury and/or Property Damage and/or Employers'
liability limit set forth in (a), (b) and (c) above.

All damage or injury to the joint property not covered by
insurance required by this agreement shall be borne by the
parties hereto in proportion to their interest therein. The
liability, if any, of the parties hereto in damages for claims
growing out of bodily injury to or death of third parties, or
injury to or destruction of property of third parties, resulting
from the operations, conducted hereunder not covered by insur-
ance required by this agreement shall be borne in proportion
to their interest in the Unit Area and each party individually
may acquire such additional insurance as it deems proper to
protect itself against such claims.

*621*



Exhibit "D" attached to and made a part of Letter Agreement
January 7, 1975 dated December 1, 1974, between Buttes Resources Company and
Aztec Oil & Gas Company. (Area of Mutual Interest)    1" ~ 8,000'

622



# CURRAN R. CAMPBELL, INC.

1206 BANK OF THE SOUTHWEST BUILDING HOUSTON, TEXAS 77002
(713) 224-0409

GEOLOGIST & INDEPENDENT OIL OPERATOR

*Sept- 4, 1974*

File

South
~~NORTH~~ ZULCH PROSPECT

~~MADISON~~ - ~~BRAZOS~~ - GRIMES COUNTIES, TEXAS

Mr. W. A. Nowotny
8106 Mullins
Houston, Texas . 77036

This letter is to evidence and confirm an agreement between you (Nowotny) and the undersigned (Campbell) as follows:

1. (a) As used herein, the term "Existing Burdens" means all royalties and overriding royalties burdening any lease referred to herein at the time it is acquired by Campbell or its successors or assigns.

(b) As used herein, the term "Area of Mutual Interest" means the area outlined in blue on the plat attached hereto and made a part hereof and signed by the President of Campbell for purposes of identification.

2. As to all leases acquired by Campbell, its successors or assigns, on acreage located within the Area of Mutual Interest, Nowotny shall be assigned the following overriding royalties:

(i) If the Existing Burdens are 1/8th or less, then the overriding royalty shall be 1/24th of 8/8ths.

(ii) If the Existing Burdens are greater than 1/8th, but not greater than 1/6th, then the overriding royalty shall be 1/48th of 8/8ths.

(iii) If Existing Burdens are greater than 1/6th, then Nowotny shall not be entitled to any overriding royalty.

3. All assignments of overriding royalties to be made under the provisions hereof shall be made without warranty, either expressed or implied, and each assignment shall provide, as to each lease, that should the Lessor, therein own less than the entire fee simple estate in the oil, gas and other minerals in and under the land covered by the lease, then the overriding royalties therein assigned shall be reduced proportionately and shall be payable in the proportions which the Lessors interest in the oil, gas and other minerals bears to the entire fee simple estate therein.

Exhibit "E" to Letter Agreement between Buttes Resources Company and Aztec Oil & Gas Company, dated ~~December 1, 1974~~.
*January 1, 1975*

623

Page 2

North Zulch Prospect
Madison - Brazos - Grimes Counties, Texas


4.      It is further expressly provided and agreed that the Area
of Mutual Interest and the right of Nowotny to receive assignments
of overriding royalties in accordance with the provisions of this
letter agreement shall remain in effect for the same period of time
that the Area of Mutual Interest specified in Operating Agreement
remains in effect.

5.      Campbell to pay Nowotny $5,000.00 when well is drilled and
logged.

6.      This agreement shall be binding upon and shall inure to
the benefit of Nowotny and Campbell and their respective heirs,
successors and assigns.

        If the foregoing is your understanding of our agreement,
please indicate your approval and acceptance by signing the attached
copy hereof at the place provided and returning same to Campbell.

                            Yours very truly,

                            CURRAN R. CAMPBELL, INC.


                            _Curran R. Campbell_
                            Curran R. Campbell, President


APPROVED AND ACCEPTED:
this __ day of _____,1974.


_W. A. Nowotny_
        W. A. Nowotny



South Zulch Prospect

Area of Interest

Curran R. Campbell, Inc.
and W. A. Novotny

Signed for Identification:

# Tab 2

Tab 2

VOL 417 PAGE 709

Well Name: BUCHANAN 1, GIBBS BROS. 1, WILSON JAMES 2 AND WILSON JAMES 3

**12235**

## ASSIGNMENT AND BILL OF SALE

STATE OF TEXAS §
§      KNOW ALL MEN BY THESE PRESENTS THAT:
COUNTY OF MADISON §

SOUTHLAND ROYALTY COMPANY, a Delaware Corporation, whose address is 400 N. Sam Houston Parkway East, Suite 1200, Houston, Texas 77060 ("Assignor"), for and in consideration of ONE HUNDRED DOLLARS ($100.00) and other good and valuable consideration, receipt of which is hereby acknowledged, does hereby assign, transfer, grant and convey unto _Samson Resources Company_ whose address is _Two West Second Street, Tulsa, OK 74103_ ("Assignee"), all of Assignor's right, title and interest in and to the following:

(i)      The oil and gas leases, leasehold interests, rights and interests attributable or allocable to the oil and gas leases or leasehold interests by virtue of pooling, unitization, communitization, and operating agreements, licenses, permits, and other agreements, all more particularly described on Exhibit "A" hereto, limited as to the lands and depths indicated on Exhibit "A" (collectively the "Leases"), together with identical undivided interests in and to all the property and rights incident thereto, including, but not limited to, all rights in, to and under all agreements, product purchase and sale contracts, leases, permits, rights-of-way, easements, licenses, farmouts, options, orders, and other contracts or agreements of a similar nature to the extent same relate to the Leases;

(ii)      The wells, equipment, materials and other personal property, fixtures and improvements on the Leases as of the Effective Date (as hereinafter defined), appurtenant thereto or used or obtained in connection with the Leases or with the production, treatment, sale or disposal of hydrocarbons or waste produced therefrom or attributable thereto, and all other appurtenances thereunto belonging (the "Equipment"); provided, however, Equipment shall not include vehicles, communications equipment, tools, warehouse stock, compressors or leased equipment located on the Leases;

(iii)      All unitization, communitization, pooling, and operating agreements, and the units created thereby which relate to the Leases or interests therein described on Exhibit "A" or which relate to any units or wells located on the Leases, including any and all units formed under orders, regulations, rules, and other official acts of the governmental authority having jurisdiction, together with any right, title and interest created thereby in the Leases; and

(iv)      All of Assignor's rights to claim revenues or gas resulting from any underproduction attributable to Assignor's interest in the Leases.

All of Assignor's interest in the above-mentioned assets is herein collectively referred to as the "Interests".

Assignor reserves and retains unto itself from the Interests those certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit "A", and the right of joint use of any agreements assigned hereunder where needed for the exploration, development, and operation of any rights or acreage (either horizontally or vertically) retained by Assignor or where needed in order to exercise ancillary rights in, or for access to, adjoining or nearby properties owned by Assignor.

TO HAVE AND TO HOLD the Interests unto Assignee, its successors and assigns, forever, subject to the following terms and conditions:

SM:ASSIGNR.DOC
Revised 8/30/94

-1-



EXHIBIT 25

1029

A True and Correct Copy of Original Filed in Madison County Clerk's Office

1. This Assignment is accepted subject to, and Assignee agrees to assume and perform, any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor under the Interests and existing oil and gas leases, assignments, operating agreements, product purchase and sale contracts, leases, permits, rights-of-way, licenses, easements, options, orders, and any other agreements or contracts attributable to and affecting the Interests, including but not limited to, any and all obligations (i) to pay and deliver royalties, overriding royalties, non-participating royalties, and other burdens on production, (ii) in connection with or arising out of balancing of overproduction or underproduction from the Interests, and (iii) in compliance with all laws and governmental regulations with respect to the Interests including, but not limited to, the lawful plugging and abandonment of oil and gas wells and the restoration of the surface of the land as nearly as possible to its prelease condition, whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, are caused by Assignor's negligence and whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, arise during the period of, or from, or in connection with Assignor's ownership or operation of the Interests. Without limitation of the foregoing, Assignee agrees to assume and perform any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor for claims, losses, damages, costs, expenses, diminutions in value, suits, and causes of action of any kind or character, with respect to the environmental condition of the Interests, regardless of when the events occurred that caused such condition to exist and whether or not caused by or attributable to Assignor's negligence. Assignee shall, to the fullest extent permitted by law, protect, defend, indemnify and hold Assignor and its directors, officers, employees, agents and representatives of each of them, harmless from and against any and all claims, losses, damages, costs, expenses, diminutions in value, suits, causes of action or judgments of any kind or character with respect to any and all liabilities and obligations or alleged or threatened liabilities and obligations, including, but not limited to, any interest, penalty and any attorneys' fees and other costs and expenses incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability, attributable to or arising out of (i) ownership or operation of the Interests subsequent to the Effective Date, and (ii) Assignee's assumption of any liability or obligation in accordance with this paragraph.

   THE INDEMNIFICATION, RELEASE AND ASSUMPTION PROVISIONS PROVIDED FOR IN THIS ASSIGNMENT SHALL BE APPLICABLE WHETHER OR NOT THE LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE SOLELY OR IN PART FROM THE GROSS, ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, OR OTHER FAULT OF ASSIGNOR.

2. THIS ASSIGNMENT AND BILL OF SALE IS EXECUTED, DELIVERED, AND ACCEPTED WITHOUT ANY REPRESENTATION, WARRANTY OR COVENANT OF TITLE OF ANY KIND OR NATURE, EITHER EXPRESS, IMPLIED OR STATUTORY. THE INTERESTS ARE BEING CONVEYED AND ASSIGNED TO AND ACCEPTED BY THE ASSIGNEE IN THEIR "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MARKETABILITY, QUALITY, CONDITION, MERCHANTABILITY, AND/OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. IT IS UNDERSTOOD AND AGREED THAT ASSIGNEE SHALL ACCEPT ALL OF THE SAME IN THEIR "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR AND WITH ALL FAULTS AND DEFECTS, INCLUDING, BUT NOT LIMITED TO, THE PRESENCE OF NATURALLY OCCURRING RADIOACTIVE MATERIAL (NORM). IN ADDITION, ASSIGNOR MAKES NO REPRESENTATION, COVENANT OR WARRANTY, EXPRESS, IMPLIED OR STATUTORY, AS TO THE ACCURACY OR COMPLETENESS OF ANY DATA DELIVERED TO ASSIGNEE WITH RESPECT TO THE INTERESTS, OR CONCERNING THE QUALITY OR QUANTITY OF HYDROCARBON RESERVES, IF ANY, ATTRIBUTABLE TO THE INTERESTS, OR THE ABILITY OF THE INTERESTS TO PRODUCE HYDROCARBONS, OR THE PRICES WHICH ASSIGNEE IS OR WILL BE ENTITLED TO RECEIVE FOR ANY SUCH HYDROCARBONS.

3. TO THE EXTENT APPLICABLE TO THE INTERESTS OR ANY PORTION THEREOF,

2

A True and Correct Copy of Original Filed in Madison County Clerk's Office

ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT, CHAPTER 17, SUBCHAPTER E, SECTIONS 17.41 THROUGH 17.63, INCLUSIVE (OTHER THAN SECTION 17.555, WHICH IS NOT WAIVED), TEXAS BUSINESS & COMMERCIAL CODE.

4.   This Assignment and Bill of Sale shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors and assigns.

5.   This Assignment and Bill of Sale may be executed by Assignor and Assignee in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this instrument is executed the _9th_ day of September, 1994, but shall be effective as of the 1st day of September, 1994 (the "Effective Date").

**ASSIGNOR**
**SOUTHLAND ROYALTY COMPANY**

ATTEST:

By:_____

By:_____
Name: Kent Beers
Title: Attorney-in-Fact

**ASSIGNEE**

Samson Resources Company

ATTEST:

By:_____

By:_____
Name: Brian Exline
Title: Attorney in Fact

A True and Correct Copy of Original Filed in Madison County Clerk's Office

3

VOL 417 PAGE 712

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day personally appeared Kent Beers, Attorney-in-Fact for Southland Royalty Company, a Delaware Corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this 9th day of September, 1994.



COMMISSION EXPIRES:
SUSAN J. SCOTT
NOTARY PUBLIC STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 15, 1996

Notary Public in and for the State of Texas

## CORPORATION ACKNOWLEDGMENT

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of _____, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed and in the capacity therein stated as the act and deed of said corporation.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this _____ day of September, 1994.

MY COMMISSION EXPIRES:

_____

Notary Public in and for the State of Texas

## ATTORNEY-IN-FACT

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day personally appeared Brian Exline, Attorney-in-Fact for Samson Resources Company known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she/he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this 14 day of September, 1994.

MY COMMISSION EXPIRES:

SANDRA S. BARKER
MY COMMISSION EXPIRES
December 1, 1997

Notary Public in and for the State of Texas

4

A True and Correct
Copy of Original
Filed in Madison
County Clerk's Office

# EXHIBIT A

| CO FILE NO. | TYPE INSTRUMENT | INST DATE | GRANTOR LESSOR | GRANTEE LESSEE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|
| 02118700 | OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | CURRAN R. CAMPBELL, INC. | 21/661 BRAZOS COUNTY | 943 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118800 | OIL AND GAS LEASE | 08/14/74 | GIBBS BROTHERS AND COMPANY | CURRAN R. CAMPBELL, INC. | 203/414 MADISON COUNTY | 184.1 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118900 | OIL AND GAS LEASE | 08/29/74 | JAMES D. WILSON, IND. & IND. EX. | CURRAN R. CAMPBELL, INC. | 203/464 MADISON COUNTY, 21/667 BRAZOS COUNTY | 2072.33 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02119500 | OIL AND GAS LEASE | 10/11/74 | RAYMOND B. BUCHANAN, ET UX | CURRAN R. CAMPBELL, INC. | 21/679 BRAZOS COUNTY | 222.06 ACRES, MORE OR LESS, DESCRIBED IN LEASE. LESS AND EXCEPTED FROM THE ABOVE ARE THE LANDS ATTRIBUTABLE TO THE H. K. ODOM WELLS, JAMES D. WILSON #4 WELL AND THE BUCHANAN #2 WELL. |

ASSOCIATED WELLS:

| PROPERTY NUMBER | DP WELL NUMBER | WELL NAME | LOCATION |
|---|---|---|---|
| 21188 | 24300 | GIBBS BROS 1 | A. NUNLEY SVY., A-176 |
| 21189 | 1409,81464 | WILSON JAMES D #3 | JESSE K. DAVIS SVY. A-103 |
| 21189 | 85900 | WILSON JAMES D #2 | JESSE K. DAVIS SVY., A-103 |
| 21195 | 6900 | BUCHANAN 1 | HARDIN NEVELLE SVY., A-185 |

A True and Correct
Copy of Original
Filed in Madison
County Clerk's Office

VOL 417 PAGE 713

VOL 417 PAGE 714

FILED
AT 11:00 O'CLOCK A M

SEP 21 1994

JOYCE M. COLEMAN, County Clerk
BY _Audrey Stevens_
DEPUTY, MADISON COUNTY, TEXAS

Oil & Gas Asset
Clearing House



STATE OF TEXAS }
COUNTY OF MADISON }

I, JOYCE M. COLEMAN, Clerk of the County Court in and
for said County do hereby certify that the above instrument of writing dated the 24th day of Sept. 1994.
was filed for record in my office the 21st day of September, 1994 at 11:00 o'clock
a. m. and duly recorded the 26 th day of September, 1994 at 9:06 o'clock
a. m. in Official Records of said County, in Vol. 417 of pages 709
WITNESS my hand and seal of said office, this 26 th day of September 1994

Joyce M. Coleman
County Clerk, Madison County, Texas

STATE OF TEXAS
COUNTY OF MADISON
I, Charlotte Barrett. County Clerk of Madison County, Texas
do hereby certify that the foregoing is a true and correct copy
of the original record and as same appears on record in
_Official_ Record Vol. _417_
Page(s) _704-714_ in Madison County, Texas.
Given under my hand and seal of office on this day of
_September 10_ 20 _12_

By _Elizabeth Motheral_ Deputy
Elizabeth Motheral

*1034*

# Tab 3

Tab 3

No. 12-13130-012-10

| | | |
|---|---|---|
| BURLINGTON RESOURCES OIL & GAS COMPANY LP, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § § | |
| PETROMAX OPERATING CO., INC., MD AMERICA ENERGY LLC f/k/a/WOODBINE ACQUISITION LLC, PETRO TEXAS LLC, CH4 ENERGY II, LLC, and TEXCAL ENERGY SOUTH TEXAS, LP, | § § § § § § § | MADISON COUNTY, TEXAS |
| Defendants | § § § | 12TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT ON TITLE ISSUES

On this day came on for consideration Defendants Motion for Summary Judgment on Title Issues (the "Motion"). This Court having considered the Motion, all responses and replies, together with any exhibits, and the arguments of counsel, has determined that the Motion should be, and hereby is, GRANTED.

It is therefore, ORDERED, ADJUDGED, and DECREED that:

1. Burlington does not own any interest in the AMI described in the 1975 Letter Agreement made the basis of this suit; and

2. The AMI provision in the 1975 Letter Agreement has terminated.

Signed this _10_ day of _December_, 2014

Filed This _11th_ Day
of _Dec_, 20_14_
at _10:15_ m O'clock
_____. Clerk
12th / 278th Judicial District Cour
MADISON COUNTY, TEXAS
_____ Dep

_____
Judge Presiding

*1617*

# Tab 4

Tab 4

No. 12-13130-012-10

| | | |
|---|---|---|
| BURLINGTON RESOURCES OIL & GAS COMPANY LP, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| v. | § § | |
| PETROMAX OPERATING CO., INC., MD AMERICA ENERGY LLC f/k/a/ WOODBINE ACQUISITION LLC, PETRO TEXAS LLC, CH4 ENERGY II, LLC, and TEXCAL ENERGY SOUTH TEXAS, LP, | § § § § § § § | MADISON COUNTY, TEXAS |
| *Defendants* | § § | 12TH JUDICIAL DISTRICT |

## ORDER DENYING BURLINGTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT SEEKING VARIOUS DECLARATIONS

On this day came on for consideration Burlington Resources Oil & Gas Company LP's ("Burlington") Motion for Partial Summary Judgment Directed to Defendants Woodbine and PetroMax and Seeking Declarations that: 1) the Area of Mutual Interest of the January 7, 1975, Letter Agreement Remains in Force and Effect, 2) Burlington Jointly Owns a Leasehold Interest Within the Area of Mutual Interest and 3) Burlington's Rights Under the 1975 Letter Agreement and AMI Are Not Subject to Reduction or Limitation Based on the Amount of Burlington's Leasehold Ownership (the "Motion"). This Court having considered the Motion, all responses and replies, together with any exhibits, and the arguments of counsel, has determined that the Motion should be, and hereby is, DENIED.

Filed This _____ 1/ Day
of _____, 20 _____
at _____ m O'clock
_____. Clerk
12th / 278th Judicial District Court
MADISON COUNTY, TEXAS
_____ Deputy

*1618*

Signed this _10_ day of _____December_____, 2014

_____Donald Keewa_____
Judge Presiding

# Tab 5

Tab 5

CAUSE NO. 12-13130-012-10

| BURLINGTON RESOURCES OIL & GAS COMPANY LP | § § § | IN THE DISTRICT COURT OF |
|---|---|---|
| V. | § § § | |
| PETROMAX OPERATING CO., INC., WOODBINE ACQUISITION, LLC, n/k/a MD AMERICA ENERGY, LLC, PETRO TEXAS, LLC, CH4 ENERGY II, LLC, and TEXCAL ENERGY SOUTH TEXAS L.P. | § § § § § § § | MADISON COUNTY, TEXAS  12TH JUDICIAL DISTRICT |

## ORDER ON JOINT MOTION TO SEVER AND ABATE

The Court, having considered the Joint Motion To Sever And Abate, has concluded that the motion should be granted and hereby renders the following order:

It is hereby ORDERED, ADJUDGED and DECREED that the following claims asserted in this case by the following parties are hereby severed and made the subject of a separate action styled Burlington Resources Oil & Gas Company LP v. PetroMax Operating Co. Inc. Woodbine Acquisition. LLC n/k/a MD America Energy, LLC. Petro Texas, LLC, CH4 Energy II, LLC, and TexCal Energy South Texas L.P., in the 12th Judicial District Court of Madison County, Texas, and having docket number 12-13130-012-10-A:

Filed This ___19___ Day of ___March___, 20_15_ at _11:00_m O'clock _____. Clerk 12th / 278th Judicial District Court MADISON COUNTY, TEXAS _____ Deputy

SCANNED

*1640*

SCANNED

a)    Counts 1, 2, 4 and 5 of Defendant MD America Energy, LLC f/k/a Woodbine Acquisition LLC's First Amended Counterclaim, filed on September 26, 2014;

b)    The following portions of Count 3 of Defendant MD America Energy, LLC f/k/a Woodbine Acquisition LLC's First Amended Counterclaim filed on September 26, 2014:

    (1)    the request for a declaratory judgment related to record ownership in the Wilson #4 Well and the Buchanan #2 Well;

    (2)    the request for a declaratory judgment that the notices of lis pendens related to this matter filed by BROG be dissolved;

    (3)    the request for relief under Texas Property Code section 12.008 and Texas Civil Practice and Remedies Code section 12.002 arising from the wrongful nature of the notices of lis pendens;

c)    Defendant TexCal Energy South Texas, L.P.'s request for attorneys' fees contained in its Plea to the Jurisdiction, First Amended Answer and Special Exceptions to Plaintiffs' Second Amended Petition, filed on September 26, 2014, and

d)    Defendant PetroMax Operating Co., Inc.'s counterclaims for equitable suit to quiet title and attorneys' fees in its First Amended Plea to the Jurisdiction, Answer and Counterclaim and Special Exceptions to Plaintiff's First Amended Petition, filed on June 27, 2013.

The district clerk is directed to file in Cause No. 12-13130-012-10-A the following pleadings previously filed in this case and orders previously rendered in this case:

1.    Plaintiff Burlington Resources Oil & Gas Company LP's Second Amended Petition, filed on July 3, 2013.

*1641*



2. PetroMax Operating's First Amended Answer to Plaintiff's First Amended Petition, filed on June 27, 2013.

3. Defendants Petro Texas, LLC's and CH4 Energy II, LLC's Plea to the Jurisdiction, Answer and Special Exceptions, filed on June 26, 2013.

4. MD America Energy's Plea to the Jurisdiction, Answer, and Special Exceptions to Plaintiff's Second Amended Petition, filed on September 26, 2014

5. TexCal Energy South Texas' Plea to the Jurisdiction, First Amended Answer, and Special Exceptions to Plaintiff's Second Amended Petition, filed September 26, 2014

6. Defendant MD America Energy, LLC f/k/a Woodbine Acquisition LLC's First Amended Counterclaim, filed on September 26, 2014.

7. Plaintiff's Original Answer to Woodbine's Counterclaim and Special Exceptions filed on August 26, 2013.

8. Defendant TexCal Energy South Texas, L.P.'s Plea to the Jurisdiction, First Amended Answer and Special Exceptions to Plaintiffs' Second Amended Petition, filed on September 26, 2014.

9. Defendant PetroMax Operating Co., Inc.'s First Amended Plea to the Jurisdiction, Answer and Counterclaim and Special Exceptions to Plaintiff's First Amended Petition, filed on June 27, 2013.

10. The two summary judgment orders signed by this Court on December 10, 2014.

11. This Order on Joint Motion to Sever and Abate.



The effect of this order is to render final for appeal the summary judgment orders signed by this Court on December 10, 2014.

It is ORDERED, ADJUDGED and DECREED that the severed case, Cause No. 12-13130-012-10-A, is hereby abated during the pendency of the appeal by Burlington Resources Oil & Gas Company LP of this Court's December 10, 2014, orders.

Dated:      ___17  March_____, 2015


_____
DISTRICT JUDGE PRESIDING


APPROVED AS TO FORM:


HAGANS BURDINE MONTGOMERY &
        RUSTAY, P.C.

By: _____
        Fred Hagans
        State Bar No. 08685500
        fhagans@hagans-law.com
        Kendall C. Montgomery
        State Bar No. 14293900
        kmontgomery@hagans-law.com

3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:        (713) 222-2700


*1643*

SCANNED

Telecopier: (713) 547-4950

**ATTORNEYS FOR PLAINTIFF BURLINGTON RESOURCES OIL & GAS COMPANY LP**

THOMPSON & KNIGHT LLP

By: _____
     Greg W. Curry
     State Bar No. 05270300
     greg.curry@tklaw.com
     Richard B. Phillips, Jr.
     State Bar No. 24032833
     rich.phillips@tklaw.com

1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Telecopier: (214) 969-1751

**ATTORNEYS FOR DEFENDANT WOODBINE ACQUISITION, LLC, n/k/a MD AMERICA ENERGY, LLC**

BECK REDDEN LLP

By: _____
With perm: by David J. Beck
     State Bar No. 00000070
     dbeck@beckredden.com
     Thomas E. Ganucheau
     State Bar No. 00784104
     tganucheau@beckredden.com

1221 McKinney Street, Suite 4500
Houston, Texas 77010
Telephone: (713) 951-3700
Telecopier: (713) 951-3720

*1644*

SCANNED

ATTORNEYS FOR DEFENDANTS PETROMAX
OPERATING CO., INC., PETRO TEXAS LLC
and CH4 ENERGY II, LLC


PIERCE & O'NEILL, LLP

By: _____

with permission of Jesse R. Pierce
        State Bar No. 15995400
        jpierce@pierceoneill.com
        Brian K. Tully
        State Bar No. 24039217
        btully@pierceoneill.com

4203 Montrose Boulevard
Houston, Texas 77006
Telephone: (713) 634-3600
Telecopier: (713) 634-3601

COUNSEL FOR DEFENDANT TEXCAL
ENERGY SOUTH TEXAS, LP

SCANNED

# HYPERLINKED MATERIALS

[*Not included in paper copy*]

171 S.W.3d 651
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Paul FREEMAN, Appellant,

v.

STEPHENS PRODUCTION COMPANY, A Division of Stephen Group, Inc., et al., Appellees.

No. 13–04–208–CV.    |    Aug. 18, 2005.    |    Rehearing Overruled Sept. 29, 2005.

**Synopsis**

**Background:** Production company alleging it was lessee of all oil, gas and other minerals under certain land brought action against grandson of grantor who conveyed land to lessors' predecessors in interest, seeking declaration that grantor did not reserve a one-half interest in the mineral estate. Grandson counterclaimed, and lessors filed plea in intervention. The 389th District Court, Hidalgo County, Leticia Lopez, J., granted production company summary judgment, and grandson appealed.

**Holdings:** The Court of Appeals, Dori Contreras Garza, J., held that:

[1] genuine issue of material fact as to whether reservation clause in grantor's deed applied to all land conveyed by deed or just one lot precluded summary judgment on production company's declaratory judgment claim;

[2] genuine issue of material fact precluded summary judgment on estoppel by deed defense raised by grandson; and

[3] evidence submitted by grandson on his adverse possession claim was insufficient to establish that grantor and his successors in interest actually possessed the mineral estate for the requisite period of time.

Reversed and remanded.

West Headnotes (10)

**[1]    Judgment** 🔑 Particular Cases

Genuine issue of material fact as to whether reservation clause in grantor's deed to lessors' predecessors in interest applied to all land conveyed by deed or just one lot precluded summary judgment, in declaratory judgment action brought by production company seeking declaration that grandson of grantor did not own a one-third of the one-half interest in the mineral estate allegedly reserved by grantor in all of land conveyed by deed.

Cases that cite this headnote

**[2]    Deeds** 🔑 Language of Instrument

If the language of a deed is unambiguous, the court's primary duty is to ascertain the intent of the parties from the language of the deed by using the four corners rule.

Cases that cite this headnote

**[3]** **Contracts** 🗝 Ambiguity in General

Whether a written instrument is ambiguous is a question of law for the court.

Cases that cite this headnote

**[4]** **Contracts** 🗝 Existence of Ambiguity

A written instrument is ambiguous if its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning.

Cases that cite this headnote

**[5]** **Estoppel** 🗝 Nature and Elements in General

"Estoppel by deed" stands for the general proposition that all parties to a deed are bound by the recitals therein, which operate as an estoppel, working on the interest in the land if it be a deed of conveyance, and binding both parties and privies; privies in blood, privies in estate, and privies in law.

4 Cases that cite this headnote

**[6]** **Estoppel** 🗝 Persons Estopped in General

Estoppel by deed can be applied against grantors and grantees alike, along with their privies.

2 Cases that cite this headnote

**[7]** **Estoppel** 🗝 Persons to Whom Estoppel Is Available

Although the party against whom estoppel by deed is sought must be a party or a privy, there is no corresponding requirement for the party invoking estoppel.

3 Cases that cite this headnote

**[8]** **Judgment** 🗝 Particular Cases

**Judgment** 🗝 Landlord and Tenant Cases

Genuine issue of material fact as to whether acknowledgements in subsequent conveyances and mineral lease regarding mineral reservation in grantor's deed to mineral lessors' predecessors in interest acknowledged that all of property conveyed by deed or just one lot was subject to the reservation, precluded summary judgment on estoppel by deed defense raised by grantor's grandson, in declaratory judgment action brought by lessee of mineral estate seeking declaration that grandson of grantor did not own a one-third of the one-half interest in the mineral estate allegedly reserved by grantor in all of land conveyed by deed.

Cases that cite this headnote

**[9]** **Judgment** 🗝 Evidence and Affidavits in Particular Cases

Inventory of grantor's estate and affidavit of grantor's grandson regarding grandson's knowledge regarding the estate's inventory was insufficient to establish, in grandson's motion for summary judgment on his adverse possession claim, that grantor and his successors in interest owned a one-half interest in mineral estate allegedly reserved by grantor in all of land conveyed by grantor's deed, where such evidence did not prove or purport to prove that either grandson,

grantor, or any of grandson's predecessors in interest actually possessed the mineral estate for the requisite statutory period of time.

Cases that cite this headnote

[10] **Mines and Minerals** 🔑 Adverse Possession

Actual possession of the minerals must occur in order for a person to obtain ownership of a mineral interest by adverse possession.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*652** Carlos H. Ochoa, McAllen, Gary E. Ellison, Houston, Mickey Olmstead, Austin, for Appellant.

Steven W. Ellis, Corpus Christi, Charles C. Murray, Atlas & Hall, J.W. Dyer, Dyer & Associates, McAllen, for Appellees.

Donald G. Sinex, Houston, Peter A. Vermillion, Austin, for intervenors.

Before Justices YA#NEZ, CASTILLO, and GARZA.

**OPINION**

Opinion by Justice GARZA.

In this appeal from the trial court's final summary judgment, the parties dispute the terms of a 1946 deed by which Paul Freeman conveyed title to certain property to Kenneth R. Hixon and Mary Katherine Hixon (the "Freeman–Hixon Deed"). Freeman's grandson, also named Paul Freeman ("Paul"), claims that the Freeman–Hixon Deed reserved to his grandfather a one-half participating interest in and to all oil, gas, and other minerals in or under the land conveyed by the deed. Paul contends that he owns a one-third interest in this reservation. His claim is opposed by Stephens Production Company, which asserts rights to certain portions of the mineral estate through a mineral lease executed by the Hixons' successors in interest, some of who are intervenors in this matter and also oppose Paul's claim.

Stephens filed suit for declaratory judgment against Paul and four other defendants, asking the trial court to declare that the disputed reservation in the Freeman–Hixon Deed only affected a portion of the **\*653** conveyed land known as Lot 288.[1] Paul counterclaimed, seeking a declaration that the reservation was not limited to Lot 288 but affected the entire property conveyed by the deed. Subsequently, the lessors of Stephens' mineral lease filed a plea in intervention, seeking a declaration that the Freeman–Hixon Deed did not reserve any mineral interest in the land covered by their mineral lease with Stephens ("the Closner Lots") and to establish their ownership of the mineral estate of the Closner Lots.[2]

[1]   The other defendants are Hemus, Ltd., which was non-suited; Paula Kendall Taylor, individually and as independent executrix of the Estate of Byrd Freeman Kendall, deceased; Clemmie Dora Freeman; and Charles Macon Freeman.

[2]   The intervenors are Charlie A. Hudson; Gregory T. Smith; Bruce Ihrig; Charlie Hudson, Jr.; David Drinkard; Meredith Land & Minerals Company; Winne Land & Minerals, Inc.; and M.G. and B.B. Smith Partners, Ltd.

Stephens, Paul, and the intervenors each filed traditional motions for summary judgment, arguing that the Freeman–Hixon Deed was unambiguous and supported their respective positions. In addition, Stephens and the intervenors argued that Paul's

claim for declaratory relief was barred by res judicata. In response, Paul argued that the claims asserted by Stephens and the intervenors were barred by estoppel by deed and limitations. Before the trial court ruled on their motion, the intervenors settled their claims with all defendants other than Paul, and all claims between these defendants, the intervenors, and Stephens were dismissed with prejudice. The trial court then entered a final summary judgment for Stephens and the intervenors against Paul, who now appeals by four issues. Because genuine issues of material fact remain unresolved, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. [3]

[3]     The well-settled standard of review for summary judgments is concisely stated in *Fiallos v. Pagan–Lewis Motors, Inc.,* 147 S.W.3d 578, 582 (Tex.App.-Corpus Christi 2004, pet. denied).

## I.

**[1]**     In his first issue, Paul contends that the trial court erred as a matter of law by interpreting the reservation clause to apply only to Lot 288. Paul contends that the following language from the deed unambiguously reserves an undivided one-half interest in the mineral estate of all lots conveyed by the deed:

> I, Paul Freeman, ... do Grant, Sell and Convey, unto the said Kenneth R. Hixon and Mary Katherine Hixon of the County of Hidalgo of Texas all that certain lot, tract or piece or parcel of land lying and being situated in Hidalgo County, Texas, to-wit:

> All of Lot 1, Block 15; Lot 2, Block 15; The West 17.51 acres of Lot 3, Block 15; All of Lot 10, Block 15; All of Lot 9, Block 15; All of Lot 11, Block 15; All of Lot 12, Block 15; out of the Closner Subdivision of Porciones 71 and 72, also known as the San Juan Tract, Hidalgo County, Texas; EXCEPT such minerals as Grantor does not own; AND ALL of Lot No. 288 of the Kelly–Pharr Subdivision of Porciones 69 and 70, Hidalgo County, Texas; EXCEPT that there is reserved in Grantor an undivided one-half participating interest in and to all of the oil, gas or other minerals in or under said tract of land....

**[2]     [3]     [4]**     If the language of a deed is unambiguous, the court's primary duty is to ascertain the intent of the parties from the language of the deed by using the "four corners" rule.  **\*654**  *French v. Chevron U.S.A.,* 896 S.W.2d 795, 796 (Tex.1995). Whether a written instrument is ambiguous is a question of law for the court. *Lopez v. Munoz, Hockema & Reed,* 22 S.W.3d 857, 861 (Tex.2000). A written instrument is ambiguous if its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Towers of Tex., Inc. v. J & J Systems, Inc.,* 834 S.W.2d 1, 2 (Tex.1992). Such is the case here.

No single reasonable meaning clearly emerges from the language of the instrument. To the contrary, we are equally uncertain and doubtful of the opposite interpretations advanced by the parties. The reservation speaks of its subject as a "tract." Use of this singular noun indicates that the reservation applies only to Lot 288 and not to the other lots. Nevertheless, the first clause of the grant also speaks of a "lot, tract or piece or parcel of land," even though the deed conveys eight different lots. Thus, the reservation's use of the singular noun "tract" to describe its subject is consistent with the deed's use of the singular noun "tract" to describe multiple lots and, in fact, the entire conveyance. This indicates that the reservation applies to all lots. Still, the deed refers to the Closner Lots collectively as the "San Juan Tract" and then proceeds to list Lot 288 separately, indicating that the Closner Lots and Lot 288 are treated as two different tracts. The reservation would then apply only to the second tract, Lot 288. Further complicating matters is the reservation's location in a clause rather than a separate sentence. It thus appears to modify only the noun immediately preceding it, Lot 288. Given the foregoing considerations, this Court can only speculate as to the effect of reservation. We are uncertain and doubtful of both interpretations advanced by the parties.

Because the deed is ambiguous, the trial court erred by granting summary judgment based on its interpretation of the deed. A jury should hear evidence and determine the parties' intent. *See Columbia Gas Transmission Corp. v. New Ulm Gas,* 940 S.W.2d 587, 589 (Tex.1996); *see also J. Hiram Moore, Ltd. v. Greer,* 172 S.W.3d 609, ——, No. 02–0455, 2005 WL 1186334, \*4, 2005 Tex. LEXIS 428, \*10 (May 20, 2005) (publication pending). Paul's first issue is sustained in part and overruled in part.

## II.

 **[5]**    In his second issue, Paul contends that the trial court erred by denying his motion for summary judgment based on estoppel by deed. As this Court recently noted in *Sauceda v. Kerlin,* "Estoppel by deed stands for the general proposition that 'all parties to a deed are bound by the recitals therein, which operate as an estoppel, working on the interest in the land if it be a deed of conveyance, and binding both parties and privies; privies in blood, privies in estate, and privies in law.' " *Sauceda v. Kerlin,* 164 S.W.3d 892, 915 (Corpus Christi, 2005, no pet. h.) (quoting *Wallace v. Pruitt,* 1 Tex.Civ.App. 231, 20 S.W. 728, 728–29 (Tex.Civ.App.-Houston 1892, no writ)).

In support of his motion for summary judgment, Paul produced evidence that Kenneth R. Hixon and other subsequent interest holders executed multiple conveyances, as well as an oil, gas, and mineral lease, acknowledging that the mineral reservation covered all land conveyed by the Freeman–Hixon Deed, including the Closner Lots. Based on this evidence, Paul argues that the doctrine of estoppel by deed prevents Stephens and the intervenors from taking a position contrary to that of Hixon and their other predecessors in interest.

Stephens and the intervenors, in turn, argue that estoppel by deed cannot be  **\*655**  applied against grantees but only against grantors. They further contend that Paul cannot use estoppel by deed because he was not a party to the instruments upon which he relies. Finally, they maintain that the instruments produced as evidence by Paul conveyed interests in Lot 288, as well as the Closner Lots, and thus their references to the prior mineral reservation simply placed later grantees on notice of the reservation's existence as to certain acreage out of the land conveyed (i.e., Lot 288).

 **[6]**    **[7]**    We disagree with two of these contentions. First, estoppel by deed can be applied against grantors and grantees alike, along with their privies. *See id.* at 915–916. Second, this Court is aware of no requirement that the litigant invoking estoppel by deed be a party to the deed. Although the party against whom estoppel is sought must be a party or a privy, to this Court's knowledge, there is no corresponding requirement for the party invoking estoppel. No cases imposing such a requirement have been cited by Stephens or the intervenors.

 **[8]**    We turn to the evidence produced in support of Paul's motion. As argued by Stephens and the intervenors, the instruments relied upon by Paul convey interests in both the Closner Lots and Lot 288. Because there is no dispute that Lot 288 is subject to the reservation of the Freeman–Hixon Deed, the acknowledgment of the reservation in these instruments is not necessarily an acknowledgment that the reservation applies to the Closner Lots. In fact, two of the instruments use the same murky language and format as the Freeman–Hixon Deed, making this Court no more certain of their meaning than that of the Freeman–Hixon Deed. [4]

[4]        These instruments are (1) a warranty deed from Kenneth Hixon and Katherine Hixon to Morris Granville Smith recorded on December 10, 1947 and (2) a special warranty deed from Morris Granville Smith and his wife, Barbara Smith, to intervenor M.G. and B.B. Partners, Ltd., which is dated August 29, 1997.

However, one of the instruments uses a different format and provides some evidence that the reservation applies to the Closner Lots. This document, a special warranty deed, was executed on September 18, 2001 between intervenor M.G. and B.B. Smith Partners, Ltd. and Keller Real Estate Investments, Inc. (the "Smith–Keller Deed"). It specifically conveys 66.23 acres out of Lots 1, 2, 3, and 10, Block 15 of the Closner Subdivision, which it refers to as "Tract 1." The Smith–Keller Deed states that Tract 1 is subject to the undivided one-half reservation provided for by the Freeman–Hixon Deed. Although the Smith–Keller Deed thus appears to be conclusive proof that the reservation applies to the Closner Lots, its evidentiary value is belied by a second conveyance made within the same deed. Along with Tract 1, the Smith–Keller Deed also conveys land referred to as "Tract 2," which is comprised of 239.01 acres out of Lots 2, 3, 8, 9, 10, 11, 12, and 13, Block 15 of the Closner Subdivision and Lots 287, 288, 289, and 290 of the Kelly–Pharr Subdivision. Notably, the deed does not list the reservation provided for by the Freeman–Hixon Deed as one of the 47 reservations applicable to Tract 2. This is especially noteworthy because Tract

2 includes not only portions of the Closner Lots but also Lot 288. Tract 2 also includes Lots 2, 3, and 10, portions of which are included in Tract 1 and expressly made subject to the reservation of the Freeman–Hixon Deed. Further diminishing the evidentiary value of the Smith–Keller Deed is the exclusion of Lots 9, 11, and 12 of the Closner Subdivision from Tract 1. These lots are included in Tract 2, which is not expressly subject to the reservation **\*656** of the Freeman–Hixon Deed. In sum, the Smith–Keller Deed is some evidence that the reservation extends to the Closner Lots, but it is inconsistent and therefore insufficient to eliminate all genuine issues of material fact. *See* Tex.R. Civ. P. 166a(c).

The final instrument submitted by Paul is a November 19, 1975 oil, gas, and mineral lease executed by Morris Granville Smith and Barbara Smith in favor of Paul S. Freeman, Paul's grandfather. The lease grants

> All our mineral interest in Lots One (1), Two (2), Three (3), Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12) and Thirteen (13) ... in Block Fifteen (15), John H. Closner, et al Subdivision, Hidalgo County, Texas; and Lot Two Hundred Eighty–Eight (288), out of the Kelly–Pharr Subdivision, Hidalgo County, Texas.

The lease provides a "pooling" area of 320 acres and then states that "for purposes of calculating the rental payments hereinafter provided for, said land is estimated to comprise 160 acres, whether it actually comprises more or less." According to Paul, the difference between the 320–acre pooling area and 160–acre estimation of the land proves that the Smiths only owned one-half of the mineral interest in the land, which is the same land conveyed by the Freeman–Hixon Deed. Paul argues that the Smiths thus acknowledged that the reservation of the Freeman–Hixon Deed extends to the Closner Lots.

Although the mineral lease is some evidence to support Paul's contention, it fails to eliminate all genuine issues of material fact. *See id.* The exact acreage of the land covered by the mineral lease is not stated anywhere in the lease. Paul assumes that the acreage is 320, but this amount is derived from the pooling provision, not from any statement regarding the exact acreage of the land. If the correct acreage of the land were 160 acres, Paul's theory would fail because the mineral interest conveyed would be 100% of what the Smiths owned. Without parol evidence, it is impossible to know with any certainty whether the actual acreage is 160, 320, or some other amount. Accordingly, Paul did not establish his entitlement to judgment as a matter of law on his defense of estoppel by deed. Paul's second issue is therefore overruled.

## III.

In his third issue, Paul contends that the trial court erred by granting intervenors' motion for summary judgment based on res judicata. The trial court's judgment specifies that its decision was based on its interpretation of the Freeman–Hixon Deed, not on res judicata. The judgment states that the Freeman–Hixon Deed did not reserve any mineral interest in the Closner Lots to Paul Freeman Senior. Accordingly, this Court need not consider whether the judgment could be upheld based on res judicata. *See* Tex.R.App. P. 47.1; *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993). Paul's third issue is overruled.

## IV.

 **[9]**    **[10]**    In his fourth issue, Paul contends that the trial court erred by failing to grant his motion for summary judgment against the intervenors based on limitations. According to Paul, the intervenors or their predecessors-in-title have been on notice of his grandfather's claim of ownership of the minerals since at least 1949 and are therefore barred by the statute of limitations from disputing ownership. We construe this as a claim of adverse possession, as the only authority relied upon by Paul is *Natural Gas Pipeline Co. of America v. Pool,* 124 S.W.3d 188, 192–93 (Tex.2003), a case involving a claim of adverse possession of a mineral estate. Paul's motion **\*657** for summary judgment alleges that his grandfather "long continued possession and exercise of dominion as an owner of one-half of the mineral in the subject lands"; however, the evidence attached to the motion

is insufficient evidence to prove this assertion.[5] Because actual possession of the minerals must occur, *see id.,* the trial court did not err by denying Paul's motion for summary judgment based on adverse possession. Paul's fourth issue is overruled.

[5]   Attached to the motion are an inventory of the estate of Pat Freeman and an affidavit by Paul, which discusses Paul's knowledge regarding the inventory. The evidence does not prove or purport to prove that either Paul, his grandfather, or any of Paul's other predecessors-in-interest actually possessed the mineral estate for the requisite statutory period of time.

## V.

As it relates to the claims between Stephens, Paul, and the intervenors, the judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion. The remainder of the judgment, specifically, the dismissal with prejudice of the claims between Stephens, the other defendants, and intervenors, has not been challenged in this appeal and is therefore affirmed. *See* Tex.R.App. P. 44.1(b).

**All Citations**

171 S.W.3d 651, 162 Oil & Gas Rep. 563

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Lot # | Description | | | | Buyer | Total |
|-------|-------------|---|---|---|-------|-------|
| 154.13 | FASKEN F-44 1 | | TX | ANDREWS | | |
| | BPO WI .135877 | APO WI .135877 | | BOPD | | |
| | BPO NRI .110400 | APO NRI .110400 | | MCFD | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | MIDLAND FARMS | | |
| | OPERATOR: M W PETROLEUM CORP | SELLER: EL PASO PRODUCTION | | | | |
| | DEPTH LIMITATION | | | | | |
| 154.14 | FASKEN N 1 | | TX | ANDREWS | | |
| | BPO WI .135877 | APO WI .135877 | | BOPD | | |
| | BPO NRI .110400 | APO NRI .110400 | | MCFD | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | MIDLAND FARMS | | |
| | OPERATOR: M W PETROLEUM CORP | SELLER: EL PASO PRODUCTION | | | | |
| | DEPTH LIMITATION | | | | | |
| 155.1 | UNIVERSITY E | | TX | ANDREWS | | |
| | BPO WI .052732 | APO WI .052732 | | BOPD 15.00 | | |
| | BPO NRI .043257 | APO NRI .043257 | | MCFD 4.00 | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | HUTEX | | |
| | OPERATOR: AMERICAN EXPL | SELLER: SAMSON RESOURCES COMPANY | | | | |
| | WELLBORE ONLY | | | | | |
| 156.1 | NEWTON 1-A | | TX | BORDEN | | |
| | BPO WI .000000 | APO WI .000000 | | BOPD 12.00 | | |
| | BPO NRI .000000 | APO NRI .000000 | | MCFD .00 | | |
| | BPO ORRI .094492 | APO ORRI .094492 | | DUNIGAN | | |
| | OPERATOR: PERMIAN RESOURCES | SELLER: ARCO | | | | |
| | ROYALTY INTEREST | | | | | |
| 157.1 | BUCHANAN 1 | | TX | BRAZOS | | |
| | BPO WI .250000 | APO WI .250000 | | BOPD 14.00 | | |
| | BPO NRI .203333 | APO NRI .203333 | | MCFD 28.00 | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | KURTEN WOODBINE | | |
| | OPERATOR: BUTTES RESOURCES CO | SELLER: SOUTHLAND ROYALTY | | | | |
| 157.2 | GIBBS BROS 1 | | TX | BRAZOS | | |
| | BPO WI .250000 | APO WI .250000 | | BOPD 4.00 | 191 | $35,000 |
| | BPO NRI .198125 | APO NRI .198125 | | MCFD 9.00 | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | KURTEN WOODBINE | | |
| | OPERATOR: BUTTES RESOURCES CO | SELLER: SOUTHLAND ROYALTY | | | | |
| 157.3 | WILSON JAMES D O | | TX | BRAZOS | | |
| | BPO WI .250000 | APO WI .250000 | | BOPD 3.00 | | |
| | BPO NRI .203333 | APO NRI .203333 | | MCFD SHUT-IN | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | KURTEN WOODBINE | | |
| | OPERATOR: BUTTES RESOURCES CO | SELLER: SOUTHLAND ROYALTY | | | | |
| 157.4 | WILSON JAMES D UNIT 2 | | TX | BRAZOS | | |
| | BPO WI .000000 | APO WI .250000 | | BOPD 11.00 | | |
| | BPO NRI .000000 | APO NRI .203333 | | MCFD 12.00 | | |
| | BPO ORRI .000000 | APO ORRI .000000 | | KURTEN WOODBINE | | |
| | OPERATOR: BUTTES RESOURCES CO | SELLER: SOUTHLAND ROYALTY | | | | |
| | APO ONLY | | | | | |

This catalog is provided for convenience purposes only. All information is provided without warranty as to accuracy or completeness.
Bidders should verify all information and the condition of properties being sold prior to bidding.

(40)

BURCOP00001606

| Lot # | Description | | | Buyer | Total |
|-------|-------------|--|--|-------|-------|

| Lot # | Description | Buyer | Total |
|-------|-------------|-------|-------|
| 1.1 | PORTER-MAY-FOWLER  AL  FAYETTE<br>BPO WI .112271  APO WI .097427  BOPD .00<br>BPO NRI .096103  APO NRI .083783  MCFD 100.00<br>BPO ORRI .000000  APO ORRI .000000  12 14S-13W<br>OPERATOR: SAMSON RESOURCES  SELLER: SAMSON RESOURCES COMPANY | | $1,000 |
| 2.1 | AUSTIN W A#1-9  AL  LAMAR<br>BPO WI .103647  APO WI .103647  BOPD .00<br>BPO NRI .087846  APO NRI .087846  MCFD SHUT-IN<br>BPO ORRI .000000  APO ORRI .000000  9 13S-15W<br>OPERATOR: MERIDIAN OIL SERVICES  SELLER: SAMSON RESOURCES COMPANY<br>WELLBORE ONLY | | |
| 2.2 | AUSTIN W A#9-13  AL  LAMAR<br>BPO WI .051508  APO WI .051508  BOPD .00<br>BPO NRI .042511  APO NRI .042511  MCFD SHUT-IN<br>BPO ORRI .000000  APO ORRI .000000  9 14S-15W<br>OPERATOR: BRIDGE OIL COMPANY  SELLER: SAMSON RESOURCES COMPANY<br>OVERPRODUCED BY 1,502 MCF AS OF 10/93 | | |
| 2.3 | BONZELL MCGEE 13-8  AL  LAMAR<br>BPO WI .041667  APO WI .041667  BOPD .00<br>BPO NRI .035319  APO NRI .035319  MCFD 190.00<br>BPO ORRI .000000  APO ORRI .000000  13 6S-16W<br>OPERATOR: PRUET PRODUCTION  SELLER: SAMSON RESOURCES COMPANY<br>OVERPRODUCED BY 3,076 MCF AS OF 4/94 | | |
| 3.1 | BROWN #1-9  AL  LAMAR<br>BPO WI .537214  APO WI .363541  BOPD .00<br>BPO NRI .461217  APO NRI .313128  MCFD 95.00<br>BPO ORRI .000000  APO ORRI .000000  1 15S-14W<br>OPERATOR: SAMSON RESOURCES  SELLER: SAMSON RESOURCES COMPANY<br>OPERATED PROPERTY, WELLBORE ONLY | | |
| 4.1 | CU C-03-09  AL  MOBILE<br>BPO WI .050000  APO WI .050000  BOPD 5.60<br>BPO NRI .037500  APO NRI .037500  MCFD .00<br>BPO ORRI .000000  APO ORRI .000000  3 1N-3W<br>OPERATOR: CITRONELLE UNIT MGR  SELLER: ADVENT TRADING COMPANY | | |
| 5.1 | TALLEY UNIT #B-1  AR  COLUMBIA<br>BPO WI .044384  APO WI .044384  BOPD 20.00<br>BPO NRI .038836  APO NRI .038836  MCFD .00<br>BPO ORRI .000000  APO ORRI .000000  1 20S-22W<br>OPERATOR: PHILLIPS PETROLEUM  SELLER: SAMSON RESOURCES COMPANY | | |

This catalog is provided for convenience purposes only. All information is provided without warranty as to accuracy or completeness.
Bidders should verify all information and the condition of properties being sold prior to bidding.

(1)

BURCOP00001567

| Lot # | Description | | | | | Buyer | Total |
|-------|-------------|--|--|--|--|-------|-------|
| 63.1 | GEIS #1 | | OK | BLAINE | | | |
| | BPO WI 1.000000 | APO WI 1.000000 | BOPD | 3.30 | | | |
| | BPO NRI .805735 | APO NRI .805735 | MCFD | 18.00 | | | |
| | BPO ORRI .802062 | APO ORRI .802062 | 33 18N-10W | | | | |
| | OPERATOR: MARATHON OIL | SELLER: MARATHON OIL COMPANY | | | | | |
| | GAS NRI = .802061 DISBURSEMENT RESPONSIBILITY, WELLBORE ONLY | | | | | | |
| 64.1 | GOULD 20-1 | | OK | BLAINE | | | |
| | BPO WI .500000 | APO WI .484375 | BOPD | .90 | | | |
| | BPO NRI .393750 | APO NRI .381367 | MCFD | 16.00 | | | |
| | BPO ORRI .000000 | APO ORRI .000000 | 20 17N-13W | | | | |
| | OPERATOR: WARD PETROLEUM | SELLER: MARATHON OIL COMPANY | | | | | |
| | WELLBORE ONLY, OVERPRODUCED BY 10,423 MCF AS OF 1/94 | | | | | | |
| 65.1 | HELMER #26-1 | | OK | BLAINE | | | |
| | BPO WI .045747 | APO WI .045747 | BOPD | .00 | | | |
| | BPO NRI .038564 | APO NRI .038564 | MCFD | 119.00 | | | |
| | BPO ORRI .000000 | APO ORRI .000000 | 26 18N-11W | | | | |
| | OPERATOR: LOUIS DREYFUS NAT GAS SELLER: MARATHON OIL COMPANY | | | | | | |
| | LEASEHOLD, POSSIBLE BEHIND PIPE | | | | | | |
| 65.2 | AUDREY #1-26 | | OK | BLAINE | | | |
| | BPO WI .000000 | APO WI .000000 | BOPD | 3.10 | | | |
| | BPO NRI .000000 | APO NRI .000000 | MCFD | 79.00 | | | |
| | BPO ORRI .005577 | APO ORRI .005577 | 26 18N-11W | | | | |
| | OPERATOR: LOUIS DREYFUS NAT GAS SELLER: MARATHON OIL COMPANY | | | | | | |
| | ==LEASEHOLD== | | | | | | |
| 66.1 | JANTZEN 34-1 | | OK | BLAINE | | | |
| | BPO WI .250000 | APO WI .250000 | BOPD | .00 | | | |
| | BPO NRI .205078 | APO NRI .205078 | MCFD | 96.00 | | | |
| | BPO ORRI .000000 | APO ORRI .000000 | 34 19N-10W | | | | |
| | OPERATOR: PETROLEUM RESERVE | SELLER: MARATHON OIL COMPANY | | | | | |
| | WELLBORE ONLY | | | | | | |
| 66.2 | JANTZEN 34-2 | | OK | BLAINE | | | |
| | BPO WI .408273 | APO WI .253906 | BOPD | .00 | | | |
| | BPO NRI .341620 | APO NRI .208252 | MCFD | 1.00 | | | |
| | BPO ORRI .000000 | APO ORRI .000000 | 34 19N-10W | | | | |
| | OPERATOR: PETROLEUM RESERVE | SELLER: MARATHON OIL COMPANY | | | | | |
| | WELLBORE ONLY | | | | | | |
| 67.1 | KARBER FARMS #1 | | OK | BLAINE | | | |
| | BPO WI .968750 | APO WI .871875 | BOPD | .80 | | | |
| | BPO NRI .777800 | APO NRI .696353 | MCFD | 51.00 | | | |
| | BPO ORRI .000000 | APO ORRI .000000 | 28 19N-12W | | | | |
| | OPERATOR: MARATHON OIL | SELLER: MARATHON OIL COMPANY | | | | | |
| | DISBURSEMENT RESPONSIBILITY, WELLBORE ONLY, OVERPRODUCED BY 1,708 MCF AS OF 4/94 | | | | | | |

This catalog is provided for convenience purposes only. All information is provided without warranty as to accuracy or completeness. Bidders should verify all information and the condition of properties being sold prior to bidding.

(17)

BURCOP00001583